The CENTRAL TRUST COMPANY and Albert E. Heekin, Jr., Co-Executors of the Estate of Albert E. Heekin, Deceased

v.

The UNITED STATES.

Katharine Heekin HERRLINGER, James R. Heekin, Jr., and the Central Trust Company, Executors under the Will of James J. Heekin, Deceased

v.

The UNITED STATES.

The CENTRAL TRUST COMPANY, Successor Executor and Trustee under the Will of Alma R. Heekin, Deceased

v.

The UNITED STATES.

Nos. 196–58, 199–58, 200–58.

United States Court of Claims.

July 18, 1962.

No. 196–58:

Thomas L. Conlan, Cincinnati, Ohio, for plaintiffs (Kyte, Conlan, Wulsin & Vogeler, Cincinnati, Ohio, were on the briefs.)

Nos. 199–58 and 200–58:

John W. Warrington, Cincinnati, Ohio, for plaintiffs (Graydon, Head & Ritchey, Cincinnati, Ohio, were on the briefs).

Earl L. Huntington, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant.

PER CURIAM.

These cases were referred by the court, pursuant to Rule 45, Rules of Court of Claims, 28 U.S.C., to Saul Richard Gamer, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed April 17, 1962. Plaintiffs in case No. 196–58 filed their notice of intention to except to the commissioner's findings and recommendations on May 2, 1962, and on June 18, 1962, moved to withdraw this notice. Plaintiffs in case No. 199–58 and case No. 200–58 filed their notices to except to the commissioner's findings and recommendations on May 1, 1962, and on June 13, 1962, moved to withdraw these notices. On June 15, 1962, the defendant filed its reply advising the court that it had no objection to the withdrawal of the notices and on June 22, 1962, the court allowed plaintiffs' motions to withdraw the notices of intention to except in all three cases.

Plaintiffs in their motions to withdraw their notices of intention to except also moved, pursuant to Rule 46(a), that the court adopt the commissioner's report as the basis for its judgment in the cases. Defendant's reply filed June 15, 1962, concurred in these motions. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases. Plaintiffs are therefore entitled to recover and judgment is entered to that effect. The amounts of recovery will be determined pursuant to Rule 38 (c).

It is so ordered.

OPINION OF THE COMMISSIONER

These suits are for the refund of federal gift taxes. They involve the common question of the value of shares of stock of the same company. A joint trial was therefore conducted.

On August 3, 1954, Albert E. Heekin made gifts totaling 30,000 shares of stock of The Heekin Can Company. The donor had formerly, for 20 years, been president of the Company and at the time of the gifts was a member of its board of directors. The gifts were composed of 5,000 shares to each of six trusts created for the benefit of his three sons, each son being the beneficiary under two trusts. Following his death on March 10, 1955, the executors of his estate filed a gift tax return in which the value of the stock was fixed at $10 a share. On October 28, 1957, however, they filed an amended gift tax return and a claim for refund, contending that the correct value of the Heekin Company stock on August 3, 1954 was $7.50 a share.

On October 25, 1954, James J. Heekin made gifts totaling 40,002 shares of Heekin Can Company stock. This donor, a brother of Albert E., had also formerly been, for 23 years, the president of the Company and at the time of the gifts was chairman of the board. The gifts were composed of 13,334 shares to each of three trusts created for the benefit of his three children and their families. Separate gift tax returns with respect to these (and other) gifts were filed by both James J. Heekin and his wife, Alma (who joined in the stock gifts), in which the value of the stock was similarly declared to be $10 a share. However, on January 21, 1958, James filed an amended gift tax return and a claim for refund, also contending that the correct value of the stock on October 25, 1954, was $7.50

a share, and on the same day, the executor of Alma's estate (she having died on November 9, 1955) filed a similar amended return and claim for refund.

On February 5, 1958, the District Director of Internal Revenue sent to James J. Heekin and the executors of the estates of Alma and Albert E. Heekin notices of deficiency of the 1954 gift taxes. Each of the three deficiencies was based on a determination by the Commissioner of Internal Revenue that the value of the Heekin Company stock on the gift dates was $24 a share.

Consistent with his deficiency notices, the District Director, on May 15, 1958, disallowed the three refund claims that had been filed, and in July 1958 payment was made of the amounts assessed pursuant to the deficiency notices. After the filing in August and September 1958 of claims for refund concerning these payments, the claims again being based on a valuation of $7.50, and the rejection thereof by the District Director, these three refund suits were instituted in the amounts of $169,876.19, $95,927.08, and $94,753.70 with respect to the Albert E. Heekin, James J. Heekin and Alma Heekin gifts, respectively, plus interest.

The Heekin Can Company is a well-established metal container manufacturer in Cincinnati, Ohio. In 1954, the year involved in these proceedings, its principal business consisted of manufacturing two kinds of containers, its total production being equally divided between them. One is known as packer's cans, which are generally the type seen on the shelves of food markets in which canned food products are contained. The other is referred to as general line cans, which consist of large institutional size frozen fruit cans, lard pails, dairy cans, chemical cans, and drums. This line also includes such housewares as canisters, bread boxes, lunch boxes, waste baskets, and a type of picnic container familiarly known by the trade names of Skotch Kooler and Skotch Grill. On the gift dates its annual sales, the production of five plants, were approximately $17,-000,000.

The Company was founded in 1901 in Cincinnati by James Heekin, the father of the donors Albert and James. In 1908, it built a six-story 250,000 square foot factory in Cincinnati, which is still its headquarters and one of its main operating plants, producing general line cans. In 1917 it acquired a plant in Norwood, a suburb of Cincinnati, which has since become entirely surrounded by the city, and entered the packer's can business. By 1954, it was a multi-story plant with about 275,000 square feet, having grown irregularly throughout the years, one section having four floors, another three, and another only one.

In 1946, the Company branched out from Cincinnati and established a packer's can plant at Chestnut Hill, Tennessee, on property leased from and contiguous to the plant of its largest customer, which used the entire output of the Heekin plant. The cans were run by conveyor directly into the customer's packing plant.

In 1949, the Company built a 100,000 square foot plant in Springdale, Arkansas, to supply its customers in the Ozark area on a more competitive basis concerning freight costs, a large part of which, under the industry's freight-equalization practice, it had theretofore absorbed.

In 1952, the Company established its fifth plant, constituting an operation at Blytheville, Arkansas, similar to the one at Chestnut Hill, Tennessee. The plant was on leased property adjacent to the customer's plant, with the cans running directly into such plant. By 1954 this concept of installing can-making lines immediately adjacent to customers' packing plants was a recognized practice in the industry. Thus, the Company was progressively adapting itself to the modern practices of its industry.

From the beginning, the Heekin family has dominated the enterprise. James, the founder, was its president from 1901 to 1905. He was succeeded by his son, James J., one of the donors herein, who served as president for 23 years. In 1928, another son, Albert E., another do-

nor herein, then became president, serving for 20 years. He was succeeded in 1948 by still another son, Daniel M., who served for 6 years. In March 1954, Albert E. Heekin, Jr., the son of donor Albert E. and the grandson of the founder, succeeded to the presidency. A lawyer, he had served the Company up to 1950 as its legal counsel, joining the Company in that year as assistant to the president. On August 3, 1954, of the ten-member board of directors, eight were members of the Heekin family, five of whom were sons of the founder, and three his grandsons. Both donors were members of the board, James J. being chairman. On October 25, 1954, the board was similarly constituted, except for the death of one son in August. Despite this family domination, there was no indication on the gift dates that the enterprise was not capably managed or that salaries were in any way excessive.

On the gift dates, the Company had 254,125 shares of common stock outstanding, there being no restrictions on their transferability or sale. There was no other class of stock. Including the 70,002 shares involved in these cases, a total of 180,510 shares were owned by 79 persons who were related to James Heekin, the founder. Thus, the Heekin family owned approximately 71 percent of all of the outstanding stock. The remaining 73,615 shares were owned by 54 unrelated persons, most of whom were employees of the Company and friends of the family.

Six major customers accounted for almost one-half of Heekin's 1954 business. Relations with these important customers were long-standing and excellent. One of these customers, the Hamilton Metal Products Company, which placed over $2,000,000 worth of business with Heekin in 1954, and for whom Heekin manufactured the Skotch Kooler and Grill, had, prior to the gift dates, advised Heekin of its need for certain new products, and on August 3, 1954 (one of the gift dates), Heekin's board of directors authorized the expenditure of approximately $90,000 for new tooling and equipment at its Cincinnati plant for the manufacture of such products. Another major customer was the Reynolds Tobacco Company, which placed almost $1,500,000 of business with Heekin in 1954 and with whom Heekin had dealt since 1908.

As indicated, freight costs play an important part in Heekin's business. These costs are significant in two aspects. One is the cost of transporting raw material to Heekin's plants. In this respect Heekin was quite favorably located. It has a dock on the Ohio River in Cincinnati, permitting it to take advantage of inexpensive water transportation of steel shipped from Pittsburgh, with a consequent advantage over some of its competitors in the same area who receive their raw materials by rail. The other important freight aspect is, as above noted, the cost of shipping the final product to the customer, and which factor motivated the establishment of its Springdale, Arkansas, plant. The Hamilton Metal Products Company was located only 25 miles from Cincinnati, giving Heekin an important freight advantage. And also, on August 3, 1954, Heekin's board of directors authorized the expenditure of about $650,000 for new tooling, machinery and equipment for its Norwood plant so that Heekin could enter the new field of manufacturing beer cans. At that time no other company in the Cincinnati area was engaged in the production of such cans, and Heekin concluded that, with the freight advantage it would have over its competitors in serving the brewers of the Cincinnati area, a profitable new source of business would be developed.

In 1954, favorable economic conditions generally prevailed in the can-manufacturing industry, and demand was at a record level. Indeed, this was the condition throughout the container and packaging industry, and optimism generally prevailed about the continuation of the then current high demand.

But Heekin had its problems too. It is a relatively tiny factor in a highly competitive industry dominated by two

giants, the American Can Company and the Continental Can Company. In 1954, these two companies, each with over $600,000,000 of annual sales produced from 76 and 40 plants respectively, together accounted for about 75 percent of the country's total can sales. Three other can manufacturing companies, the National Can Corporation, the Pacific Can Company, and Crown Cork & Seal Co., Inc., together made about 8 percent of the sales. Heekin, with its five plants, did a little less than 1 percent of the total business. Prices in the can-making industry are for practical purposes established by American and Continental. When they announce prices, Heekin goes up or down with them. Unable to compete on a price basis, Heekin strives to give its customers better personal service, which, because it is smaller and closer knit, it can frequently do.

Probably Heekin's major problem is the age, and the resulting relative inefficiency, of a large part of its plant and equipment, and its inability to finance a large-scale program of modernization. This again is in part a problem of its small size. The relatively small amounts it can use for this purpose are generated by retained earnings, and it has consequently fallen behind the giants of the industry in erecting efficient plants and installing modern, high-speed, automatic can-making lines. During the war, Heekin was unable to buy new equipment. However, such competitors as American, Continental, and Pacific manufactured their own can-making equipment and were able to forge ahead, and such equipment as Heekin was able to buy after the war from other companies could not match American and Continental's modern automatic packer's can equipment, which produced 500 cans a minute. Heekin's older packer's can equipment could turn out only about 300 cans a minute, and even the new equipment it was able to buy after the war could attain, with difficulty, speeds of only 400 cans a minute. In 1954, about 90 percent of Heekin's equipment had been acquired in the middle 1930's or prior thereto. In all

its plants, the Company had 37 can-making lines, 11 of which were very old and still hand operated.

Similarly, Heekin's Cincinnati and Norwood multistory plants, which accounted for about 75 percent of Heekin's total 1954 production, were less efficient than modern, single-story buildings. The can-making business is primarily a material-handling one, requiring a rapid and efficient flow of large amounts of material through the plant, from the receipt of the raw materials to the shipment of finished products. In a single-story building, materials can freely be moved horizontally with fork-lift trucks and conveyors, whereas in its six-story Cincinnati and four-story Norwood plants, elevators are used for the vertical movement of materials, resulting in excessive labor and handling costs and more difficult production controls. The proceeds of a $3,000,000 long-term loan which Heekin secured in 1950 were for the most part not available for such a plant and equipment modernization program.

However, the competitive disadvantage of lack of modern equipment was reflected more on the packer's can phase of its business than on the general line cans, which are produced both by Heekin and its competitors on only semiautomatic equipment. Such equipment does not lend itself as readily to the speed and automation required with respect to packer's cans. Heekin's semiautomatic lines were capable of producing around 300 cans a minute.

The Heekin stock was not listed on any stock exchange, and trading in it was infrequent. There was some such activity in 1951 and 1952 resulting from the desire of certain minority stockholders (the descendants of a partner of James Heekin, the founder) to liquidate their holdings, consisting of 13,359 shares. One individual alone had 10,709 shares. Arrangements were privately made in early 1951 by these stockholders with Albert E. Heekin and his son, Albert E. Heekin, Jr., to sell these holdings at the prearranged price of $7.50 a share. These shares were all sold, commencing

March 22, 1951, and ending April 16, 1952, in 44 separate transactions, 35 of which took place in 1951 and 9 in 1952. No attempt was made to sell the shares to the general public on the open market. All sales were made to Heekin employees and friends of the Heekin family at such $7.50 price. Other than these 1951 and 1952 sales, the only sales of stock made prior to the gift dates consisted of one sale of 100 shares in 1953 by one Heekin employee to another, and one sale in 1954 of 200 shares, again by one Heekin employee to another, both sales also being made for $7.50 a share.

Against these background facts, the valuation question in dispute may be approached. Section 1000 of the Internal Revenue Code of 1939 (26 U.S.C. 1952 Ed., § 1000, 53 Stat. 144), the applicable statute, imposed a tax upon transfers of property by gift, whether in trust or otherwise. Section 1005 provided that "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

Section 86.19(a) of the Regulations issued with respect thereto (Treasury Regulations 108, 8 Fed.Reg. 10858) defines such property value as the price at which the property "would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * * Such value is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property. For example, in the case of shares of stock * * *, such unit of property is a share * * *. All relevant facts and elements of value as of the time of the gift should be considered." With respect to determining the fair market value per share at the date of the gift, subsection (c) (6) stated that, if actual sales or bona fide bid and asked prices are not available, the value should be arrived at "on the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock."

Further, a lengthy Revenue Ruling (54–77, 1954–1 Cum.Bull. 187), entitled "Valuation of stock of closely held corporations in estate tax and gift tax returns," was in effect at the time of these gifts which outlined "the approach, methods and factors to be considered in valuing shares of the capital stock of closely held corporations for estate tax and gift tax purposes." After warning in section 3 that fair market value, "being a question of fact," depends on the "circumstances in each case," and that "No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases," and that there is ordinarily "wide differences of opinion as to the fair market value of a particular" closely held stock, section 4 goes on to enumerate the following factors which "are fundamental and require careful analysis in each case": (1) the nature of the business and its history, (2) the general economic outlook of business in general and the specific industry in particular, (3) the book value of the stock and the company's financial condition, (4) the company's earning capacity, (5) its dividend-paying capacity, (6) its goodwill, (7) such sales of the stock as have been made as well as the size of the block to be valued and (8) "the market price of stocks of corporations engaged in the same or similar line of business which are listed on an exchange." After discussing each factor in detail, the Ruling goes on to consider such matters as (a) the weight to be accorded the various factors, concluding that, in a product selling company, primary consideration should normally be given to the earnings factor and (b) the necessity of capitalizing the earnings and dividends at appropriate rates.

There appears to be no dispute between the parties concerning the validity, or the propriety of applying the principles, of the Regulations and the Ruling to these cases. The dispute arises from the differences of opinion which are inherent in the Ruling's statement that "A sound valuation will be based upon all the rele-

vant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance."

Where, as in the present cases, the problem is the difficult one of ascertaining the fair market value of the stock of an unlisted closely held corporation, it is not surprising that, in assisting the court to arrive at an "informed judgment," the parties offer the testimony of experts. In such a situation, the opinions of experts are peculiarly appropriate. Bader v. United States, 172 F.Supp. 833 (D.C.S.D.Ill.). At the trial, the taxpayers produced three experts, and the Government one.

One of plaintiffs' experts was the senior partner of a firm of investment bankers and brokers. He felt that the limited prior sales of the stock at $7.50 warranted the consideration of the other factors listed in the Revenue Ruling applicable to closely held corporations. There were four major factors which he considered in arriving at his conclusion. The first was book value. Utilizing the Company's balance sheet as of December 31, 1954 (a date subsequent to the gift dates), the book value came to about $33 a share. In this connection he noted that the Company's financial position at that time was sound, with a ratio of current assets to current liabilities of about 4.3 to 1. However, principally because of the age and multistoried inefficiency of the Company's two main plants at Cincinnati and Norwood, he reduced the book value factor by 50 per-

cent. The second factor was earnings. The Company's audited annual statements for 1952, 1953 and 1954, which he accepted without adjustment, showed that the average of its earnings for these 3 years was $1.77 a share. He felt that, in the case of this Company, a price earnings ratio of 6 to 1 would be appropriate, but, recognizing that this was the most important factor, he weighted it to give it double value. The third factor was dividend yield. In said 3 years, the Company paid an annual dividend of 50 cents. Accepting this figure as the dividend the Company would be likely to pay in the future, he concluded that an investor would look for a 7 percent yield on this stock, and capitalized it on that basis. The fourth factor was the prior sales at $7.50. Adding and weighting these figures, he derived a value of $10.50 a share. However, because the stock was not listed on any exchange, and was closely held, with sales being infrequent, he discounted that value by 25 percent to reflect the stock's lack of marketability, and came out with an ultimate valuation of $7.88 a share.[1] This is the value plaintiffs now rely on in these cases. This value was applied to the entire block of 70,002 shares and to both dates, a block which, he noted, would give a purchaser only a minority position. Considering the Revenue Ruling's suggestion to investigate "the market price of stocks of corporations engaged in the same or similar line of business which are listed on an exchange," this witness felt that there were no listed companies that could properly be compared with Heekin.

[1.]

| | | |
|---|---|---|
| *Book Value*=$33.20, less 50% | | $16.60 |
| *Earnings*= | Average 3 years=1.77; price to earnings ratio=6:1=$10.62. Weighted to two factors | 21.24 |
| *Dividends*= | To give yield of 7% at rate of 50¢ per annum, would have to sell at | 7.14 |
| *Prior Sales* | | 7.50 |
| | Total all factors | 52.48 |
| | Divided by 5 to obtain weighted average | 52.48÷5=$10.50 |
| | Less 25% for lack of marketability | 2.62 |
| | | 7.88 |

Plaintiffs' second expert, a certified public accountant who had experience in and was familiar with the principles involved in valuing stocks of closely held corporations, arrived at the somewhat higher valuations of $9.50 per share for the 30,000 shares given on August 3, 1954, and $9.65 for the 40,002 given on October 25, 1954. He recognized that the previous sales of the stock in 1951, 1952, 1953 and 1954 at $7.50 could not be determinative because, being all at the same selling price, they could not have reflected the month-to-month or year-to-year fluctuations of actual value, which was the problem herein involved. He concluded that that price was predicated primarily to give a yield of 6⅔ percent based on an annual dividend rate of 50 cents, which the Company had paid each year from 1946 through 1954, except for a 1½-year period in 1950 and 1951. In 1950, the Company suffered extraordinary losses and dividends were suspended, and in 1951, only 25 cents was paid. Accordingly, he considered the situation appropriate for the application of the principles enunciated in the Revenue Ruling.

In so doing, he too concluded that the four major factors to be considered were earnings, dividend yield, book value, and the price of the prior sales. As to earnings, he computed, from the Company's audited statements for the years 1950–54, without adjustment, average annual earnings of $1.68. Using the comparative method of calculating price-earnings ratios of listed companies in the same or similar business and then correlating such results to Heekin, he selected 11 leading corporations in the container industry (only two of which, American Can and Continental Can, were can companies), and computed their average price-earnings ratio over the similar 5-year period at 10 to 1, with 1954 alone producing a ratio of 11.6 to 1 because

of the rise in prices of container industry stocks in that year.[2] However, he capitalized Heekin's 5-year average earnings of $1.68 at an earnings multiple of only eight times which he considered appropriate for a "marginal" company like Heekin. Since this produced a value of $13.44 based only on earnings, as of December 31, 1954, due to his using the figures for the full year 1954, he adjusted the figure to August 3, 1954, the first gift date, by reducing the figure by 14.1 percent, a figure derived by calculating the general rise in a relatively large group of certain other industry stocks between August 3 and December 31. Thus, on the basis of earnings alone, he calculated a value of $11.55 as of August 3.

As to dividends, this witness then calculated Heekin's average for the 5 years ended December 31, 1954, at 35 cents per share and capitalized that figure at 6 percent, which he considered to be appropriate in Heekin's case in view of the 5-year average dividend yield of 5.1 percent for the 11 leading companies in the container industry which he used as comparatives, and the even higher returns, on a 5-year average basis, afforded by general groups of leading industrials during that period. Thus, on the basis of a 6 percent dividend yield alone, he calculated a value of $5.83.

Using as factors the value figures derived as described on the bases of price earnings ($11.55) and dividend yield ($5.83) ratios, together with a book value figure of $33.23 as of December 31, 1954, and a $7.50 figure as the price of the prior sales, the witness then weighted these four factor figures, giving the earnings and dividend factors 40 percent each (i. e. each figure multiplied by 4), and the book value and prior sales figure 10 percent each (i. e. each figure multiplied by 1). This total figure was then reduced by 15 percent to reflect the stock's lack of marketability (which was

---

2. He noted that this 10-to-1 ratio was higher than the Dow-Jones average of 9.9 for 30 industrials, the Standard & Poor average of 9.3 for 50 industrials, and the Moody average of 9.7 for 125 industrials for the same 5-year period.

equated to the underwriting cost of floating 30,000 shares) which, after dividing by the weight factor (10), gave the market price as of August 3 as $9.37,[3] which he rounded out to $9.50.

Using the same criteria and method, the witness valued the 40,002 shares given on October 25, 1954, at the slightly higher price of $9.65, the price of listed stocks having generally risen between the two dates.

The taxpayers' third expert, a senior officer in a firm specializing in valuing the stocks of closely held corporations, came out with the still higher valuation of $11.41 per share on August 3, in blocks of 10,000 ($11.76 in a block of 30,000 shares). For the shares given on October 25, however, his value was only $9.40 per share in blocks of 13,334 shares ($9.47 in a block of 40,002 shares).

This witness also used the technique of selecting comparable companies traded on a national exchange, ascertaining, by a very comprehensive study, the relationship between their market prices and their earnings, "earnings paid out," and return on invested capital (to which he added long-term debt), and then correlating the data to Heekin. Unlike the other two experts, he did not accept the exact figures of the audited statements of annual earnings, but studied them with a view to detecting and eliminating abnormal and nonrecurring items of loss or profit in order to obtain a better picture of the Company's normal operation and of what an investor, therefore, might reasonably conclude the Company's fu-

ture performance would be. With such adjustments and eliminations, he thus recast the Company's earnings for the years 1949–1953. He selected eight companies in both the can and glass container fields to use as comparatives.

In calculating Heekin's earnings, the witness used a 5-year average, as adjusted. One of the adjustments was to the Company's abnormal profits in 1951 as a result of the Korean war, which he eliminated and reduced to more normal levels. Another was to eliminate, as abnormal and nonrecurring, rather large losses the Company suffered in 1950, 1951 and 1952 as a result of the operations of a subsidiary which was liquidated. By applying a price-earnings ratio of 11.82, as derived from the comparative companies, he determined a value of the Heekin stock on August 3, based only on earnings, of $13.78 per share; a value based on earnings paid out (in which he included not only dividends but also interest on long-term debt) on the capital invested in the business of $9.59 per share; and a value based on invested capital of $31.34 per share. To these three determinants of value, he added the fourth factor of $7.50 derived from the prior sales price. He too then weighted these figures, assigning a weight of 33⅓ percent each to the values based on earnings and earnings-paid-out, and 16⅔ percent each to the values based on invested capital and the prior stock sales. This gave a total weighted value of $14.26. He then too applied a 20-percent reduction for lack of marketability, which he also equated with flotation costs for blocks of

---

3.

| | | Weight | Total |
|---|---|---|---|
| Price earnings ratio | $11.55 | 4 | $46.20 |
| Dividend—35¢ capitalized at 6% | 5.83 | 4 | 23.32 |
| Stock sales | 7.50 | 1 | 7.50 |
| Book value | 33.23 | 1 | 33.23 |
| | | | 110.25 |
| Less 15%—amount for nonmarketability (flotation cost) | ..... | ..... | 16.51 |
| | | | 93.74 |
| Divided by factor 10 | ,.... | ..... | 9.37 |

10,000 shares, resulting in the net figure of $11.41 as of August 3.[4]

The same technique produced a figure of $9.40 per share as of October 25, 1954, in blocks of 13,334 shares.[5] This lower valuation is attributable to the drop in the market prices of the comparative companies between August 3 and October 25, 1954. One of the comparatives (Pacific Can Company) which had been used for the August 3 valuation was dropped since it enjoyed a rather atypical sharp rise after such date due to a proposed merger.

■ Various major criticisms can fairly be made of these three appraisals offered by plaintiffs. First, they all give undue weight as a factor to the $7.50 price of the prior stock sales. Almost all of these sales occurred in the relatively remote period of 1951 and early 1952. Only one small transaction occurred in each of the more recent years of 1953 and 1954. Such isolated sales of closely held corporations in a restricted market offer little guide to true value. Wood, Adm. v. United States, 89 Ct.Cl. 442, 29 F.Supp. 853; First Trust Co. v. United States, 3 Am.Fed.Tax R.2d 1726 (D.C. W.D.Mo.); Drayton Cochran v. Commissioner, 7 CCH Tax Ct.Mem. 325; Schnorbach v. Kavanagh, 102 F.Supp. 828 (D.C. W.D.Mich.). In an evaluation issue, this court recently even gave little weight to the sale of shares on a stock exchange when the amount sold was "relatively insignificant." American Steel Foundries v. United States, Ct.Cl. No. 197–54, decided April 7, 1961 (slip opinion, p. 4). To the same effect is Heiner v. Crosby, 24 F.2d 191 (C.C.A.3d) in which the court rejected stock exchange sales as being determinative and upheld the resort to "evidence of intrinsic value" (p. 194). Furthermore, the $7.50 price of the 1951 and 1952 sales evolved in early 1951 during a period when the Company was experiencing rather severe financial difficulties due to an unfortunate experience with a subsidiary which caused a loss of around $1,000,000, and when, consequently, the Company found itself in a depleted working capital position and was paying no dividends. Further, there is no indication that the $7.50 sales price evolved as a result of the usual factors taken into consideration by informed sellers and buyers dealing at arm's length. Fair market value presupposes not only hypothetical willing buyers and sellers, but buyers and sellers who are informed and have "adequate knowledge of the material facts affecting the value." Robertson v. Routzahn, 75 F.2d 537, 539 (C.C.A.6th); Paul, Studies in Federal Taxation (1937), pp. 193–4. The sales were all made at a prearranged price to Heekin employees and family friends. The artificiality of the price is indicated by its being the same in 1951, 1952, 1953 and 1954, despite the varying fortunes of the Company during these years and with the price failing to reflect, as would normally be expected, such differences in any way.

4.

| | |
|---|---|
| Value based on earnings—13.78 @ 33⅓% | $4.59 |
| Value based on earnings paid out—9.59 @ 33⅓% | 3.20 |
| Value based on invested capital—31.34 @ 16⅔% | 5.22 |
| Value based on stock sales—7.50 @ 16⅔% | 1.25 |
| 100% | 14.26 |
| Less 20% for lack of marketability (flotation cost in blocks of 10,000 shares) | 2.85 |
| Net value | 11.41 |
| Less 17.5% reduction if in a block of 30,000 shares | 11.76 |

5. $9.47 per share in a block of 40,002 shares.

■ Secondly, in using the Company's full 1954 financial data, and then working back from December 31, 1954, to the respective gift dates, data were being used which would not have been available to a prospective purchaser as of the gift dates. "The valuation of the stock must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates." Bader v. United States, supra, 172 F.Supp. at p. 840. Furthermore, in the working-back procedure, general market data were used although it is evident that the stocks of a particular industry may at times run counter to the general trend. This was actually the situation here. Although the market generally advanced after August 3, 1954, container industry stocks did not.

■ Thirdly, the converse situation applies with respect to the data used by the third expert. His financial data only went to December 31, 1953, since the Company's last annual report prior to the gift dates was issued for the year 1953. But the Company also issued quarterly interim financial statements, and by the second gift date, the results of three-quarters of 1954 operations were available. In evaluating a stock, it is essential to obtain as recent data as is possible as section 4 of the Revenue Ruling makes plain. Naturally, an investor would be more interested in how a corporation is currently performing than what it did last year or in even more remote periods. Although the use of interim reports reflecting only a part of a year's performance may not be satisfactory in a seasonal operation such as canning, it is possible here to obtain a full year's operation ending on either June 30 or September 30, 1954, which would bring the financial data up closer to the valuation dates.

■ Fourth, it is accepted valuation practice, in ascertaining a company's past earnings, to attempt to detect abnormal or nonrecurring items and to make appropriate eliminations or adjustments. As shown, only the plaintiffs' expert who came out with the highest August 3 valu-

ation attempted to do this by adjusting the excessive Korean war earnings and by eliminating the unusual losses suffered in 1950, 1951 and 1952 arising from the operations of a financing subsidiary (Canners Exchange, Inc.) that had been liquidated in 1952. The reason this is important is that past earnings are significant only insofar as they reasonably forecast future earnings. The only sound basis upon which to ground such a forecast is the company's normal operation, which requires the elimination or adjustment of abnormal items which will not recur. Plaut v. Smith, 82 F. Supp. 42 (D.C.Conn.), aff'd., sub. nom. Plaut v. Munford, 188 F.2d 543 (Ct.App. 2d Cir.). In American Steel Foundries v. United States, supra, the court similarly viewed the "earning prospects" of the company whose stock was being evaluated in light of its past earnings "as constructed by the accountants, eliminating or adjusting losses due to strikes or other nonrecurring events." And the court in White & Wells Co. v. Commissioner, 50 F.2d 120 (C.C.A.2d), also held that: " * * * past earnings * * * should be such as fairly reflect the probable future earnings" and that to this end "abnormal years" may even be entirely disregarded. The Revenue Ruling (sec. 4.02(d)) specifically points out the necessity of separating "recurrent from nonrecurrent items of income and expense."

■ Fifth, in deriving a past earnings figure which could be used as a reasonable basis of forecasting future earnings, none of plaintiffs' experts gave any consideration to the trend of such past earnings. They simply used the earnings of prior years and averaged them. But such averages may be deceiving. Two corporations with 5-year earnings going from the past to the present represented by the figures in one case of 5, 4, 3, 2, and 1, and in the other by the same figures of 1, 2, 3, 4, and 5, will have the same 5-year averages, but investors will quite naturally prefer the stock of the latter whose earnings are consistently moving upward. The Revenue Ruling specifically recognizes this in providing (sec. 4.02(d))

that: "Prior earnings records usually are the most reliable guide as to the future expectancy, but resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation. If, for instance, a record of progressively increasing or decreasing net income is found, then greater weight may be accorded the most recent years' profits in estimating earning power."

And further, since the most recent years' earnings are to be accorded the greatest weight, care must be taken to make certain that the earnings figures for such years are realistically set forth. For instance, in Heekin's case, profits for 1952–54 were understated because a non-contributory retirement plan for hourly employees was established in 1951 for which the costs attributable to 1950 and 1951 were borne in the later years of 1952–54. Similarly, 1954 profits were further understated because they reflected (1) a renegotiation refund arising out of excess profits made in 1951, and (2) they were subjected to a charge of $174,203.54 ($83,617.70 after taxes) as a result of a deduction from 1954 profits only of certain expenses attributable to both 1954 and 1955. This abnormal doubling up of 2 years' expenses in one year was permitted by a change in the tax laws which became effective in 1954 (and which was later revoked retroactively) which allowed taxpayers such as Heekin to change their methods of accounting so as to effect the accrual in 1954 of these 1955 expenses. If proper adjustments are made in Heekin's 1954 statements for these items, the earnings for the 1954 period prior to the gift dates would be realistically increased and given due weight insofar as earning trends are concerned.

None of plaintiffs' experts made any of these adjustments in connection with a trend study or otherwise.

■ Sixth, it is generally conceded that, as stated by the Revenue Ruling, in evaluating stocks of manufacturing corporations such as Heekin, earnings are the most important factor to be considered. Bader v. United States, supra. Yet only one of plaintiffs' experts, who assigned double value to this factor, gave it such weight. As shown, the other two assigned the dividend factor equal weight. Some investors may indeed depend upon dividends. In their own investment programs, they may therefore stress yield and even compare common stocks with bonds or other forms of investment to obtain the greatest yields. However others, for various reasons, may care little about dividends and may invest in common stocks for the primary purpose of seeking capital appreciation. All investors, however, are primarily concerned with earnings, which are normally a prerequisite to dividends. In addition, the declaration of dividends is sometimes simply a matter of the policy of a particular company. It may bear no relationship to dividend-paying capacity. Many investors actually prefer companies paying little or no dividends and which reinvest their earnings, for that may be the key to future growth and capital appreciation.

And further, in capitalizing the dividend at 6 and 7 percent, as did two of the experts, rates of return were used which well exceeded those being paid at the time by comparable container company stocks. And still further, one of the experts used a 35-cent dividend rate as the basis for his capitalization because that was the average paid for the 5 years ended December 31, 1954. However, it seems clear that an annual dividend rate of 50 cents a share would be the proper rate to capitalize since that was the dividend paid by Heekin every year since 1945 except for the year 1950 and the first half of 1951 when, as shown, dividends were temporarily suspended. By the end of 1951 the Company had recovered from the situation causing the suspension and the normal dividend (quarterly payments of 12½ cents per share) was then resumed. By August and October 1954, Heekin's demonstrated earning capability and financial position were such that there was little doubt it would at least continue its 50-cent an-

nual dividend, which represented only about 25 percent of its current earnings per share. To dip back into this 1950–51 atypical period to compute an "average" of dividends paid for the past 5 years is unrealistic.

■ Finally, the record indicates that all three experts took too great a discount for lack of marketability. Defendant disputes the propriety of taking this factor into consideration at all. It seems clear, however, that an unlisted closely held stock of a corporation such as Heekin, in which trading is infrequent and which therefore lacks marketability, is less attractive than a similar stock which is listed on an exchange and has ready access to the investing public. This factor would naturally affect the market value of the stock. This is not to say that the market value of any unlisted stock in which trading is infrequent would automatically be reduced by a lack of marketability factor. The stock of a well-known leader in its field with a preeminent reputation might not be at all affected by such a consideration, as was the situation with Ford Motor Company stock before it was listed. Couzens v. Commissioner, 11 B.T.A. 1040. But the stock of a less well-known company like Heekin which is a comparatively small factor in its industry is obviously in a different position. In such a situation, a consideration of this factor is appropriate, especially where, as here, only a minority interest is involved. Bader v. United States, supra; Baltimore National Bank v. United States, 136 F.Supp. 642 (D.C.Md.); Schnorbach v. Kavanagh, supra; Cochran v. Commissioner, supra; First Trust Co. v. United States, supra. But see Couzens v. Commissioner, supra; Estate of Katharine H. Daily v. Commissioner, 6 CCH Tax Ct.Mem. 114.

Defendant concedes that if such a factor is appropriate in these cases, a reasonable method of determining the diminution in value attributable to lack of marketability is to determine how much it would cost to create marketability for the block of stock in question. This was the method used by the court in First Trust Co. v. United States, supra. The record shows that for a company of Heekin's size, and for blocks of 30,000 and 40,000 shares, which would appear to be the appropriate considerations, flotation costs would amount to about 12.17 percent of the gross sales prices. However, as shown, the discounts taken by plaintiffs' experts for this factor ranged from 15 to 25 percent.

For all the above reasons, the opinions of plaintiffs' experts are not wholly acceptable.

Defendant produced one expert, an employee of a recognized appraisal company. His primary work over many years was the valuation of intangibles, including closely held stock. His opinion was that the value of the Heekin stock in question on August 3 and October 25, 1954, was $16 and $15.25 per share, respectively. This witness also used the comparative appraisal method, considering a group of stocks in the can and glass container industries. As part of a very comprehensive study, he selected eight container companies, six engaged in can production and two in glass container production, glass container enterprises being similar to those engaged in can production. He considered net assets as a key factor in the determination of a stock price, and one which keeps a stock price from declining to zero when earnings become zero or even when losses are suffered and when a price-to-earnings ratio would therefore become meaningless. He therefore developed for the comparative companies percentage ratios of profits and dividends to net worth as well as market value to net worth. In developing figures for the profits and dividends of the comparative companies for the past 5 years, he gave weight to the trends thereof. He then developed Heekin's profits over the period 1950 through September 1954, making adjustments for the retirement plan costs, the losses from subsidiaries, the renegotiation refund, and the abnormal 1951 profits, in order to reflect the more nearly normal operations over the period. Adjusted profits were developed for the 12-month periods

ending June 30 and September 30, 1954. Before correlating the percentages developed for the comparative companies to Heekin, however, he concluded that only two of such companies, United Can and Glass Company and Crown Cork & Seal Company, Inc., could be considered conformable to Heekin. The others, including the giants of their industries, such as American Can, Continental Can, and Owens Illinois Glass Company which, because of acquisitions, diversification, premium investment quality position, and mere size, were not considered fairly comparable, were eliminated. Correlating the data developed with respect to such two companies, he concluded that, as of August 3, Heekin would be worth 59.5 percent of net worth, or $19.72 per share, a stock exchange equivalent of 19¾ per share. The similar method produced $18.78 per share as the value as of October 25, 1954, or a trading equivalent of 18¾.

This witness too felt that the correlation process resulted in comparing Heekin with seasoned listed stocks enjoying marketability, and that an adjustment should be made for the closely held nature of the Heekin stock with its resultant lack of marketability, especially where only a minority interest was involved. Similarly equating this adjustment to deductions a seller would experience through floating the shares through an underwriter, which he calculated to be almost 20 percent, resulted in net valuations of 16 and 15¼ as of August 3 and October 25, 1954, respectively. Since these values approximate Heekin's current assets (including inventories) less all of its liabilities, without giving any value at all to any of its plants, equipment, or other noncurrent assets, he concluded they were extremely conservative. Employing the common tests of price-

to-earnings ratio and yield on the basis of the current 50-cent dividend, these values would result in a price-to-earnings ratio of 7.24:1 as of August 3, based on $2.21 adjusted net profit per share for the 12 months ending June 30, as well as a 3.13 percent dividend yield, and a ratio of 8.29:1 as of October 25, based on $1.84 adjusted net profit per share for the 12 months ending September 30, as well as a 3.28 percent dividend yield.

This witness' study has certain meritorious features. It is based on justifiable adjustments in Heekin's earnings records to eliminate abnormal and nonrecurring items (although he made no adjustment for the 1954 doubling up of certain expenses). It considers earnings trend. It disregards the prior $7.50 sales prices as a major factor. And in employing the Company's financial data going up to June 30 and September 30, 1954, it is based on its most recent performance. However, it has certain weaknesses too, the principal one being the limitation of the comparative companies to two, one of which, Crown Cork & Seal, leaves much to be desired as a comparative because its principal business is the manufacture of bottle caps and bottling machinery, an entirely different business. Only 40 percent of its business is in can production. On the basis of size too there are great differences. At that time, Crown, including its foreign subsidiaries, was doing about $115,000,000 worth of business as against Heekin's $17,000,000. And the other comparative, United Can and Glass, presents the complication that it declared periodic stock dividends to which the witness gave no consideration, although it seems that some element of value should fairly be attributed to them.[6] Although no two companies are ever exactly alike, it being rare to have such almost ideal

6. "In theory, of course, the additional stock certificate gives him [the stockholder] nothing that he would not own without it * * *. But in actuality the payment of periodic stock dividends produces important advantages. Among them are

the following: * * * 4. Issues paying periodic stock dividends enjoy a higher market value than similar common stocks not paying such dividends." Graham & Dodd, Security Analysis, Principles and Technique (3d ed. 1951) pp. 444-5.

comparatives as were present in Cochran v. Commissioner, supra, so that absolute comparative perfection can seldom be achieved, nevertheless the comparative appraisal method is a sound and well-accepted technique. In employing it, however, every effort should be made to select as broad a base of comparative companies as is reasonably possible, as well as to give full consideration to every possible factor in order to make the comparison more meaningful.

Further, in compiling Heekin's financial data for correlation purposes, this witness used Heekin's average dividends for the 4½ years preceding the valuation dates, thus including the atypical period when no dividends were paid.

Defendant, considering its own expert's valuations to be unduly conservative, and disagreeing as a matter of law with any deduction for lack of marketability (and in any event with the amount deducted by its expert for such factor), now offers valuations on what it claims to be a more realistic basis. It also adjusts and redistributes Heekin's profits, including the "doubling up" expenses in 1954, the renegotiation refund, and the retirement plan. As comparatives, it uses for the purpose of developing a price-earnings ratio 11 can and glass container manufacturing companies, including American Can and Continental Can (although it concedes that with respect to the stock of such companies in this field, the investing public affords "some extra value coincident with size"), as well as Crown Cork & Seal and United Can. The dividend yield of seven comparative companies, based on their 1954 dividend payments, was 3.77 percent. Defendant too gives no cognizance to United Can's stock dividends, although it concedes that "stock dividends have some effect on market value." On Heekin's 50-cent dividend, the market price of Heekin stock would be $13.33, based solely on a 3.75 (the figure used by defendant) percent dividend yield.

Defendant then computes representative earnings for Heekin as $1.89 per share, based on 1953 and 1954 adjusted earnings. The average price to current earnings ratio of the 11 comparative companies in 1954 was 13 to 1. On this formula, Heekin's stock would sell for $24.57 per share if earnings were the sole factor. However, defendant reduces this figure to $22.50 for the purpose in question.

On the basis of the book value of Heekin stock being $33.15 as of June 30, 1954, and comparing the market prices of various alleged comparable companies to their book value (i. e., the stocks of 11 unidentified comparatives used by the Commissioner of Internal Revenue in making his valuation sold for 1.4 times book value), defendant concludes that Heekin stock would not sell for less than $33 per share.

The three factors of earnings, dividend yield, and book value are then weighted, earnings, considering their recognized importance for valuation purposes and the upward trend thereof, being assigned 50 percent weight, and dividend yield and book value receiving 30 percent and 20 percent respectively. On this basis, defendant arrives at a fair market value figure of $21.85 as of August 3, 1954.[7]

Since there was a slight drop in the market price of can manufacturing stocks between August 3 and October 25, 1954, defendant concludes the fair market value on the latter date would be about 50 cents less per share, or $21.35.

Thus, defendant now seeks a fair market value determination as of the gift dates of $21.85 and $21.35 respectively,

---

7.

| | |
|---|---|
| Earnings .......................................... | $22.50 × .5 = $11.2$_5$ |
| Dividend yield ................................... | 13.33 × .3 = 4.0$_0$ |
| Book value ...................................... | 33.00 × .2 = 6.6 |

$$21.85$$

in lieu of the $24 value fixed by the Commissioner of Internal Revenue.[8]

In its selection of the three basic factors to be considered in determining fair market value, the weights to be assigned to these factors, the earnings adjustments, and the use of 50 cents per annum as the proper dividend basis, this estimate has merit. However, the selection of such companies as American Can and Continental Can as comparatives—companies held in esteem in the investment world—will obviously give an unduly high result. It simply is not fair to compare Heekin with such companies and to adopt their market ratios for application to Heekin's stock. Furthermore, defendant's use of the comparatives is confusing. The employment of different comparatives for different purposes is unorthodox. When the comparative appraisal method is employed the comparatives should be clearly identified and consistently used for all purposes. And the refusal to make any allowance for lack of marketability contributes further to the unrealistic nature of defendant's fair market value estimate.

To summarize, Heekin's stock has been valued as of August 3 and October 25, 1954, in blocks of 30,000 and 40,002 shares respectively, as follows: $10, originally, by two donors and the execu-

tor of the third; $7.50, in amended returns; $7.88 by one expert of plaintiffs (upon which valuation plaintiffs now stand); $9.50 and $9.65 respectively by plaintiffs' second expert; $11.76 and $9.47 respectively by plaintiffs' third expert; $16 and $15.25 respectively by defendant's expert; $21.85 and $21.35 respectively by defendant in these proceedings; and $24 by the Commissioner of Internal Revenue.

■ The proper use of the comparative appraisal method, applying the principles already indicated, should provide a reasonably satisfactory valuation guide in these cases.[9] In its application, it would under all the circumstances herein involved appear appropriate to select the three factors of (1) earnings, (2) dividends and dividend-paying capacity, and (3) book value, as being the important and significant ones to apply. First Trust Co. v. United States, supra; Cochran v. Commissioner, supra; Bader v. United States, supra.

■ As to earnings, an examination of them for the periods from 1950 to June 30 and September 30, 1954, which are the most recent periods in relation to the gift dates, would be most representative. For this purpose, the annual profit and loss statements, plus the Company's interim balance sheets, from which can

8. This $24 value resulted from a study by the Commissioner of 11 comparatives. Their price to book value ratio was 1.4; price to average earnings, 14.3; price to current earnings, 13; and price to current dividends, 31.1.

Applying these ratios to Heekin, 1.4 times book value of $33.23 as of December 31, 1954, equals $46.52 per share. Average earnings for a 5-year period of $1.68 per share times 14.3 equals $24.02 per share. Current earnings times 13 equals $17.16 a share. Price to current dividend equals $15.55 per share.

In addition, in 1954 National Can purchased Pacific Can and the Commissioner analyzed the sale price for comparative purposes. The sale price came to 12.5 times Pacific's earnings. Application of that ratio to Heekin's 1953 earnings would price Heekin's stock at $24.38 per share. Pacific's price also represented 17 times its average 1949–1953 earnings.

Application of such ratio to Heekin would price its stock at $28.39 per share. Further, Pacific's price bore a ratio of 1.6 to book value. Application of such ratio to Heekin's stock would price it at $53.17 per share.

9. In the related estate tax area, § 2031(b) of the Internal Revenue Code of 1954 specifically provides that: "In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." 26 U.S.C. (1958 Ed.) § 2031(b).

be derived with reasonable accuracy the Company's earnings for the 12-month periods ending June 30 and September 30, 1954 (thus eliminating distortions due to seasonal factors), are the starting points. As stated, it would then be proper to make such adjustments therein as would be necessary to eliminate abnormal and nonrecurring items and to redistribute items of expense to their proper periods. In these cases, this normalizing process would require (a) the elimination from the years 1950 to 1952 of the abnormal, nonrecurring losses incident to its financing subsidiary, which had been completely liquidated by 1952; (b) the elimination of the abnormally large 1951 profits due to the Korean war; (c) the redistribution of the expenses attributable to the establishment subsequent to 1951 of a retirement plan, which expenses, although borne in later years, were also applicable to 1950 and 1951, thereby overstating 1950 and 1951 profits and similarly depressing 1953 and 1954 profits; (d) the shift from 1954 to 1951 of a renegotiation refund paid with respect to excessive 1951 profits; (e) the elimination from 1954 of the abnormally large charge relating to the accrual in 1954 of certain expenses actually attributable to 1955, as hereinabove explained, and which resulted in the doubling up of 2 years of such expenses in 1954, as permitted by a then recent change in the tax laws. The method adopted in making these adjustments, and the adjusted profit figures resulting therefrom, are set forth in detail in finding 47.

As indicated, it would then be appropriate to give due consideration and weight to the trend of such earnings. Greater weight should fairly be given to the most recent years and periods. The method adopted in finding 48 of assigning greater weight to the later periods is a reasonably accurate one, and indicates that as of June 30 and September 30, 1954, Heekin's reasonably expected annual earnings per share would be $1.93 and $1.79, based on average annual earnings of $491,460.86 and $454,492.82, respectively.

As to dividends and dividend-paying capacity, it has already been indicated that as of the gift dates, it could reasonably be expected that Heekin would continue to pay in the foreseeable future its usual 50-cent annual dividend. Indeed, on its aforesaid earnings basis, this would appear to be a conservative distribution. However, while the declaration by the board of directors of a small increase might have been considered a possibility—a 10-cent increase would, for instance, result in a corporate outlay of only $25,412 on the 254,125 shares outstanding—it seems clear, nevertheless, that no substantially larger payment, at least for some time to come, could reasonably have been anticipated. Heekin's equipment was, as shown, not modern and the Company was in need of relatively large sums for equipment and plant modernization if it hoped to continue to be a competitive factor in the industry. For such a program, the Company would have to depend almost entirely on retained earnings. A further limitation on the Company's dividend-paying capacity was its repayment obligations on its long-term debt. Annual installments on principal of $150,000 had to be made through 1965, plus 20 percent of the net income (less $150,000) for the preceding year.

As to book value, the Company's balance sheets showed the book value per share to be, conservatively, $33.15 and $33.54 as of June 30 and September 30, 1954, respectively (findings 51–53). These statements also showed the Company to be in a current sound financial condition. As of June 30, 1954, current assets alone, amounting to almost $8,700,000, far exceeded its total liabilities of approximately $4,700,000, including its long-term debt. Its ratio of current assets to current liabilities was 3.17 to 1.

With the above basic data applicable to Heekin, it is then appropriate to select as closely comparable companies as is possible whose stocks are actively traded on

an exchange, and to ascertain what ratios their market prices bear to their earnings, dividends, and book values. The application of such ratios to Heekin would then give a reasonable approximation of what Heekin's stock would sell for if it too were actively traded on an exchange.

A study of all the numerous companies considered by the experts as proper comparatives indicates that five of them, i. e., Pacific Can Company, United Can and Glass Company, National Can Corporation, Brockway Glass Co., Inc., and Thatcher Glass Manufacturing Co., Inc., are, while by no means perfect comparables, certainly at least reasonably satisfactory for the purpose in question. The detailed reasons for their selection are set forth in finding 57. In size they all fall generally into Heekin's class, and the nature of their operations is also comparable. In addition, five companies give a sufficiently broad base. Such companies as American Can, Continental Can, and Crown Cork & Seal, for the reasons already indicated, are eliminated (finding 56).

After similarly computing the earnings, as adjusted, of the comparatives for the same periods as for Heekin (finding 58), and similarly weighting them to give effect to the trend factor (finding 59), the average ratio of their market prices to their adjusted earnings as of August 3 and October 25, 1954 (the "price-earnings" ratio), was 9.45 and 9.84 to 1, respectively (finding 62). Thus, on the basis only of earnings, Heekin's stock would similarly sell for $18.24 and $17.61 per share on such dates.

Similarly, the comparatives' dividend payments for the 12 months ending June 30 and September 30, 1954, after making some allowance for United's stock dividend, show an average percent yield of 3.50 and 3.56 respectively (finding 64). Thus, on the basis only of dividend yield, Heekin's stock would similarly sell for $14.29 and $14.05 per share on August 3 and October 25, 1954, respectively (finding 65).

As to book value, the average market prices of the comparatives were 83.96 and 86.39 percent, respectively, of the book values of their common stock on said dates (finding 66). Thus, on the sole basis of the average relationship between such book values and market prices, Heekin's comparable market prices on said dates would be $27.83 and $28.98 (finding 67).

However, since the three factors of earnings, dividends, and book value are not entitled to equal weight, it becomes necessary to consider their relative importance in the case of a company such as Heekin. In this connection, plaintiffs' contention that in these cases no factor is to be considered of greater importance than dividend yield and that no investor would reasonably be expected to buy Heekin stock at a price which would afford a yield of less than 7 percent, cannot be accepted, not only for the reasons set forth above concerning the general relative importance of this factor but also because it is not supported by the specific data relating to the container industry as shown by the comparatives' yields. Investors were purchasing the stocks of comparable container companies which were yielding much less return than 7 percent. As shown, the average dividend yield of the five comparative companies was only around 3½ percent. Investors were purchasing Pacific Can at a price which afforded a yield of less than 3 percent. Indeed, they were purchasing National Can at more than $13 a share although it was paying no dividend at all.

Considering all the circumstances, it would appear appropriate to accept defendant's proposals in this respect and to consider earnings as entitled to 50 percent of the contribution to total value, and to give dividend yield (which in this case would appear to be substantially equivalent to dividend-paying capacity) 30 percent, and book value 20 percent, thereof. Cf. Bader v. United States, supra, in which the court gave 50 percent weight to earnings, and divided the remaining 50 percent equally between the

dividend yield and book value factors. Book value indicates how much of a company's net assets valued as a going concern stands behind each share of its stock and is therefore an important factor in valuing the shares. As defendant's expert pointed out, this is the factor that plays such a large part in giving a stock value during periods when earnings may vanish and dividends may be suspended. However, principally because book value is based upon valuing the assets as a going concern, which would not be realistic in the event of a liquidation of the corporation, a situation which a minority stockholder would be powerless to bring about in any event, and for the additional reasons set forth in finding 50, this factor is, in the case of a manufacturing company with a consistent earnings and dividend record, normally not given greater weight than the other two factors.

On the above percentage bases, the fair market value of Heekin's stock on August 3 and October 25, 1954, would be $18.98 and $18.83 respectively (finding 69).

These prices, however, assume active trading for Heekin's stock on an exchange, as was the situation with the comparatives. As shown, the closely held nature of, and the infrequent trading in, Heekin's stock resulted in a lack of marketability which would affect its market value. Equating the proper discount to be taken for this factor with the costs that would be involved in creating a market for the stock, a method which defendant concedes is reasonable, results in a deduction of approximately 12.17 percent for a company of Heekin's size and for blocks of 30,000 and 40,000 shares. On this basis, the fair market values of the Heekin stock as of August 3 and October 25, 1954, would be $16.67 and $16.54 respectively.

These are the values resulting largely from strictly formula and statistical applications. While such use of figures and formulas produces, of course, results which are of important significance, and may in certain instances be given con-

clusive weight, it is nevertheless recognized that determinations of fair market value can not be reduced to formula alone, but depend "upon all the relevant facts," including "the elements of common sense, informed judgment and reasonableness." Revenue Ruling, sec. 3.01. The question of fair market value of a stock "is ever one of fact and not of formula" and evidence which gives "life to [the] figures" is essential. Estate of James Smith v. Commissioner, 46 B.T.A. 337, 341–2. The selection of comparatives has been a particularly troublesome problem in these cases. National Can's erratic earnings record, even though adjustments are attempted to normalize its situation (findings 57–58), and its nonpayment of dividends (finding 64), certainly weaken its position as a comparative, and suggest the desirability of an adjustment in the final market value figures set forth above. Pacific Can's sharp rise in price after August 3, 1954, justifies a similar adjustment for the October 25, 1954, valuation. While the inclusion of the glass container manufacturers with their higher dividend yields tends to neutralize somewhat the National Can situation, an adjustment downward would, in fairness to plaintiffs, nevertheless guard against their being prejudiced by the aforementioned selections of comparatives. Furthermore, while the sales of Heekin stock at $7.50 warrant, as hereinabove pointed out, only minimal consideration, the figures derived from the above formula give them no cognizance whatsoever.

Giving important weight to the figure of $16.67 produced by the application of the comparative appraisal method as applied herein, but viewing it in light of all the facts and circumstances involved in these cases, it is concluded that the fair market value of the 30,000 shares given on August 3, 1954, was $15.50 per share.

The market for stocks of the can and glass container manufacturing companies fell somewhat between August 3 and October 25, 1954, so that ordinarily on that basis as well as on the basis of Heekin's own financial and operating

positions on October 25 as compared with August 3, a slightly lower value would be justified as of October 25 (although one of plaintiffs' experts felt that, insofar as Heekin stock is concerned, the same value should be applied to both dates, and another came out with a higher value for the second date). It seems clear, however, that the brightened prospects for increased business and profits resulting from the Company's decision in August 1954 to embark upon the beer can business and to satisfy further the demands of its largest customer for new products would, in Heekin's instance, tend to neutralize the market decline and to make its stock at least as valuable on October 25 as it had been on August 3. Accordingly, it is concluded that the fair market value of the 40,002 shares given on October 25, 1954, was also $15.50 per share.

A $15.50 valuation represents a price to adjusted earnings ratio on the gift dates of between 8 and 9 percent (somewhat less than the 9–10 percent average of the comparatives (finding 62)), a dividend yield of 3.23 percent (slightly less than the 3.5 percent average of the comparatives (finding 64)), and only 46 percent of book value (considerably less than the approximately 85 percent of the comparatives (finding 66)). On these bases, it is a figure that is fair to both sides.

Plaintiffs should consider that such a valuation prices the stock only at an amount representing the difference between current assets and total liabilities, including its long-term debt, as shown by its June 30, 1954, balance sheet. Thus, at such price, the value of the stock would be represented in whole by current assets, with no consideration whatsoever given to plant, equipment, or any other assets. As such, it would appear to be a conservative price indeed. Despite the difficulties under which it is laboring in a highly competitive industry, Heekin was, as of the valuation dates, a profitable, dividend-paying company, in sound financial condition, in an industry in which demand was at record levels, and in which it was forging ahead with rela-

tively large investments in new fields holding bright prospects. Only a disregard of these favorable factors would warrant any lower valuation.

On the other hand, defendant should consider that such a valuation would give an investor a dividend yield of less than 3.5 percent on his investment, with little prospect of any significant increase in the foreseeable future. The fact that the Company was, on the gift dates, a relatively small one competing, with a comparatively old plant, against the giants of the industry operating at high efficiency with the most modern equipment, makes unwarranted a valuation of this closely held stock representing only a minority interest on any significantly higher basis. For these reasons also the $15.50 valuation is considered to be fair and just to both plaintiffs and defendant.

On this valuation basis, plaintiffs are entitled to recover, the amount of the recovery to be determined in accordance with Rule 38(c).

### FINDINGS OF FACT

1. Plaintiffs sue to recover alleged overpayments of gift taxes on gifts of stock of The Heekin Can Company, an Ohio corporation. These gifts consisted of 30,000 shares given by Albert E. Heekin on August 3, 1954, and 40,002 shares given by James J. Heekin on October 25, 1954. Gift taxes paid were based on an Internal Revenue Service valuation of $24 a share. On the gift tax returns, as amended, a value on such dates of $7.50 a share was placed.

2. On August 3, 1954, Albert E. Heekin of Cincinnati, Ohio, created six trusts for the benefit of his three sons, George E., Charles L., and Albert E., Jr., each son being the beneficiary of two trusts. On the same date, he transferred by gift 5,000 shares of the common stock of The Heekin Can Company to each of the six trusts, resulting in total gifts of 30,000 shares, 10,000 shares to each son. The Central Trust Company, an Ohio banking corporation, was designated as cotrustee under all six trusts, with the two sons other than the particular bene-

ficiary of the trusts being designated as the other cotrustees in each instance.

3. On October 25, 1954, James J. Heekin of Cincinnati, Ohio (the brother of Albert E. Heekin hereinabove mentioned), created three trusts for the benefit of his three children, James R., Katharine Heekin Herrlinger, and Donald J., and their families, each child and family being the beneficiary of one of the trusts. On the same date, he transferred by gift 13,334 shares of the common stock of The Heekin Can Company to each of the three trusts, resulting in total gifts of 40,002 shares. The Central Trust Company was designated as cotrustee under all three trusts, with the two children other than the particular beneficiary of the trusts being designated as the other cotrustees in each instance.

4. Albert E. Heekin died on March 10, 1955. On or before March 15, 1955, there was filed in the office of the District Director of Internal Revenue, Cincinnati, Ohio, the 1954 gift tax return of the Estate of Albert E. Heekin. This return listed thereon the six gifts of shares of The Heekin Can Company stock referred to above. The gift tax liability shown on the return, in the amount of $81,695.10, was paid to the District Director of Internal Revenue, Cincinnati, Ohio, on March 18, 1955. In reporting the amount of total gifts and computing net gifts for the year 1954 as shown on such return, The Central Trust Company, as Coexecutor of the Estate of Albert E. Heekin, used a value of $50,000 for each of the six gifts, constituting a value of $10 a share.

5. On or before March 15, 1955, James J. Heekin filed in the office of said District Director a 1954 gift tax return showing a gift tax liability of $33.75, which amount was paid on March 8, 1955. Similarly, on or before March 15, 1955, Alma R. Heekin, the wife of James J. Heekin, filed in the office of the District Director a 1954 gift tax return reflecting a gift of $7,000 to one of her children and showing that no tax was due.

6. On March 16, 1955, James J. Heekin filed in the office of the District Director an amended 1954 gift tax return listing thereon the gifts of the shares of The Heekin Can Company stock above described and further listing an additional gift to one of his children of cash in the amount of $4,500. Similarly, on March 16, 1955, Alma R. Heekin filed in the office of the District Director an amended 1954 gift tax return and, in accordance with the applicable provisions of the Internal Revenue Code, reported one-half of the gifts of her husband, and deducted one-half of the value of her gifts. In reporting the amount of total gifts and computing their gift tax liability, James J. Heekin and his wife, Alma, used a value of $10 per share for the stock of The Heekin Can Company, or $133,340 for each of the three gifts. In computing his gift tax liability, James J. Heekin deducted one-half of his gifts which were reported by his wife and included one-half of the value of the gifts made in 1954 by his wife. The gift tax liability of James J. Heekin shown on this amended return in the amount of $41,482.57, less the sum of $33.75 previously paid, was paid to the said District Director on March 18, 1955. The gift tax liability shown on Alma R. Heekin's amended return in the amount of $32,796 was paid to the said District Director on March 18, 1955.

7. On October 28, 1957, The Central Trust Company and Albert E. Heekin, Jr., as Coexecutors of the Estate of Albert E. Heekin, deceased, filed in the office of said District Director an amended gift tax return and a claim for refund in which the claimants alleged that the value of the shares of The Heekin Can Company stock given by Albert E. Heekin on August 3, 1954, was $7.50 per share and that his 1954 gift tax was overstated by the sum of $19,875.55. The claim requested refund of that amount.

8. On January 21, 1958, James J. Heekin filed in the office of said District Director a claim for refund of the 1954 gift tax in the amount of $11,216.82, al-

**414**

leging that the value of The Heekin Can Company stock given by him on October 25, 1954, was $7.50 per share, rather than $10 per share as set forth on the amended return he had previously filed. On the same day, The Central Trust Company, Successor Executor and Trustee of the Estate of Alma R. Heekin, who had died on November 9, 1955, filed a similar claim for refund with said District Director in the amount of $11,250.56.

9. On May 15, 1958, the District Director gave notice by registered mail of the disallowance of each of the three aforementioned claims for refund. More than 6 months had elapsed since the filing on October 28, 1957, by the Coexecutors of the Estate of Albert E. Heekin for refund prior to the decision rendered by the District Director on May 15, 1958.

10. On February 5, 1958, the District Director sent The Central Trust Company and Albert E. Heekin, Jr., Coexecutors of the Estate of Albert E. Heekin, deceased, by registered mail a notice of deficiency in gift tax for the year 1954 in the amount of $119,288.04. He assessed such tax on May 15, 1958. On July 30, 1958, the Estate of Albert E. Heekin paid such deficiency to the Internal Revenue Service together with interest thereon in the amount of $30,712.60, a total of $150,000.64.

11. On February 5, 1958, the District Director sent James J. Heekin, by registered mail, a notice of deficiency in gift tax for the year 1954 in the amount of $68,484.22. He assessed such tax on May 5, 1958. On July 23, 1958, James J. Heekin paid such deficiency with interest thereon in the amount of $16,778.63. On August 11, 1958, James J. Heekin paid an additional $763.66 in interest. All such payments, totaling $86,026.51, were made to the Internal Revenue Service.

12. On February 5, 1958, the District Director sent The Central Trust Company, Successor Executor of the Estate of Alma R. Heekin, deceased, by registered mail, a notice of deficiency in gift tax for the year 1954 in the amount of $67,544.76. On July 23, 1958, such deficiency, with interest thereon of $16,548.47, was paid. On August 11, 1958, an additional amount of $753.16 in interest was paid. All such payments, totaling $84,846.39, were made to the Internal Revenue Service.

13. Each of the three aforementioned deficiencies in 1954 gift taxes was based on a determination by the Commissioner of Internal Revenue that the value of the stock of The Heekin Can Company, on the dates of the aforementioned gifts, was $24 per share.

14. On August 1, 1958, the Estate of Albert E. Heekin filed in the office of said District Director a claim for refund of 1954 gift tax in the amount of $150,000.64. On September 23, 1958, James J. Heekin and the Estate of Alma R. Heekin filed in the office of said District Director claims for refund of 1954 gift tax in the amount of $95,927.08 and $94,753.70, respectively. Each of such claims for refund alleged that the value of the stock of The Heekin Can Company, the subject of the aforementioned gifts, had a value of $7.50 per share on the date of the gifts. On October 15, 1958, the District Director notified the Estate of Albert E. Heekin, by registered mail, of the disallowance in full of its claim for refund. On March 2, 1959, the District Director notified James J. Heekin and the Estate of Alma R. Heekin, respectively, by registered mail, of the disallowance in full of their claims for refund.

15. James J. Heekin died September 7, 1959, and Katharine Heekin Herrlinger, James R. Heekin, Jr., and The Central Trust Company were duly appointed executors under the will of James J. Heekin and are now so acting.

16. Since Alma R. Heekin's death on November 9, 1955, her original executors have died, and The Central Trust Company has qualified as successor executor

and trustee under the will of Alma R. Heekin and is now so acting.

17. The claims asserted by the plaintiffs have not been assigned and are still owned by them.

18. The Heekin Can Company (hereinafter sometimes referred to as the "Company" or "Heekin") was incorporated on August 1, 1901. Its founder was James Heekin who was the father of several children, including Albert E. Heekin (whose estate is plaintiff in case No. 196–58), James J. Heekin (whose estate and that of his wife are plaintiffs in cases Nos. 199–58 and 200–58), Daniel M. Heekin, Robert E. Heekin and Walter V. Heekin (now also deceased).

19. The founder of the Company, James Heekin, was its president from 1901 to about 1905. His son, James J. Heekin, was president of the Company from 1905 to 1928; another son, Albert E. Heekin, was president from 1928 to 1948; and Daniel M. Heekin, another son, was president from 1948 to March 1954. In that month, Albert E. Heekin, Jr., the son of Albert E. Heekin, became president of the Company. Prior to 1950 he had been a practicing attorney in Cincinnati, Ohio, and from 1946 to 1950 served as counsel to the Company. In January 1950, he came to the Company as assistant to the president (Daniel M. Heekin, his uncle), and in 1952, he became executive vice president.

20. On August 3, 1954, the board of directors of the Company was composed of the following ten members: Albert E. Heekin, James J. Heekin (chairman of the board), Daniel M. Heekin, Robert E. Heekin and Walter V. Heekin, all of whom were brothers and the sons of the founder, James Heekin; Albert E. Heekin, Jr. and Charles L. Heekin, both of whom were sons of Albert E. Heekin; Donald J. Heekin, the son of James J. Heekin; and Clarence A. Rolfes and Thomas L. Conlan, neither of whom was related to the Heekin family. On October 25, 1954, the membership of the board remained the same, except for Walter V. Heekin, who died in August 1954.

21. In 1954, the following salaries were paid to the following officers who were members of the Heekin family: James J. Heekin, chairman of the board, $5,000; Albert E. Heekin, Jr., president, $35,000; Charles L. Heekin, vice president, $15,000; and Donald J. Heekin, vice president, $11,100. Another Heekin employed by the Company was John G. Heekin (a son of Walter V. Heekin), who earned $4,980 as a salesman. No officer received any bonus or other type of compensation. The salaries paid in prior years did not exceed those set forth for 1954, except that in 1953, Daniel M. Heekin, the then president, received $40,-000. There is no showing or any contention that any of these salaries were excessive. None of the other descendants of James Heekin, the Company's founder, numbering over 300, was employed by the Company. As of the gift dates, the Company was well managed.

22. On August 3 and October 25, 1954, the total number of common shares of the Company outstanding was 254,125. There was no other class of stock outstanding. The shares were not listed on any stock exchange. There were no restrictions on the transferability and sale of Company stock. Including the 70,002 shares involved in these cases, a total of 180,510 shares were owned by 79 persons who in some fashion were related to James Heekin, the founder of the Company. Thus, the Heekin family owned approximately 71 percent of all of the outstanding stock. The remaining amount, a total of 73,615 shares, was owned by 54 persons who were not related to James Heekin. Some of these nonrelated persons were employees of the Company. At the time of Walter V. Heekin's death in August 1954, he owned 9,145 shares.

23. Prior to 1901 James Heekin, the founder of the Company, was engaged in the business of selling coffee, tea and

spices. In that year he decided to form his own can-making company. The original can-making factory, located at Third and Eggleston Avenue, Cincinnati, Ohio, was operated by water power from the canal that ran through the area at that time. In 1908 the Company built a six-story factory at the corner of Sixth and Culvert Streets, Cincinnati, which it has occupied to the present time. This plant has approximately 250,000 square feet of floor area and is still one of the main operating plants of the Company. It is referred to as a general line plant, producing so-called "general line" cans, as distinguished from cans referred to as packer's cans, which are the type seen on the shelves of a grocery store. The general line cans manufactured by Heekin include such products of institutional size as 4–50-pound lard pails, 10–30-pound frozen fruit cans, dairy cans in gallon sizes, chemical cans and drums, as well as such housewares as canisters, bread boxes, lunch boxes, waste baskets, and picnic containers familiarly known as Skotch Koolers and Skotch Grills. Both plain and lithographed metal containers are manufactured in this plant. Lithography on metal is accomplished by offset presses. The lithographic work is sometimes performed on uncut flat sheets of tin plate, the fabrication of the can being done by others, as for instance, the liothography performed for the Prince Albert tobacco cans, the fabrication of which is performed by the Reynolds Tobacco Company itself.

24. In 1917 the Company acquired a plant in Norwood, a suburb of Cincinnati, which is wholly surrounded by the city, and commenced manufacturing packer's cans. In 1954 this plant had an overall footage of about 275,000 square feet. It was multistory, having grown irregularly through the years, so that one section had four floors, another three floors, and another one floor.

25. In 1949 the Company built a plant at Springdale, Arkansas. By 1954, this plant comprised about 100,000 square feet. It was built because of the freight-equalization practice in the can-making industry, which required a manufacturer to absorb the freight costs to his customer to the extent they exceeded the cost of freight to the nearest can-making plant. The American Can Company had built a plant at Fort Smith, Arkansas, about 60 miles from Springdale. Had Heekin continued to supply its customers in the Ozark area from its Norwood plant, it would have had to absorb the freight from Norwood to Fort Smith, and could charge the customer the freight only from the American Can plant at Fort Smith to the customer's place of business.

26. In 1946, the Company established a plant at Chestnut Hill, Tennessee, on property leased from and contiguous to the plant of Bush Brothers & Company, a dog food manufacturer, which is Heekin's largest customer. Bush used the entire output of Heekin's adjacent plant. The lease had a term of 10 years. Heekin installed its own equipment in the plant. The cans were run by conveyor directly into the Bush plant. The Heekin plant originally had only one line of can-making equipment but by 1954 the plant had two can-making production lines.

27. An operation similar to that at Chestnut Hill, Tennessee, was located at a plant in Blytheville, Arkansas, in a 5,000 square foot area under a 10-year lease and with the intent to eliminate material-handling by running the cans directly into the customer's plant. This Heekin plant, which was a one-line operation, was established in 1952. By August 1954, the concept of installing can-making lines immediately adjacent to customers' packing plants was a recognized practice in the industry.[1]

---

1. In 1956, another operation similar to that at Chestnut Hill was located at a plant in Clinton, Tennessee. Defendant's exhibit

12, p. 9. Plaintiffs' exhibit 8, p. 12, also refers to the operation of only five plants by Heekin in 1954.

28. Heekin manufactures only its general line of cans and its packer's cans, as hereinabove described. It does not manufacture any glass, plastic, wood, paper or fiber containers.

29. Prior to World War II, can-making equipment was made by two companies, Max Am's and the E. W. Bliss Company. However, these two companies ceased making such equipment at the beginning of the war. During the war Heekin was, consequently, unable to buy new equipment. After the war Bliss returned to the business, and another company, the Baldwin-Lima-Hamilton Company, also entered the field. During this entire period, the American Can Company, the Continental Can Company and the Pacific Can Company, which companies also manufacture cans, made their own can-making equipment, but neither American nor Continental, the two largest companies in the industry, nor Pacific, sell such equipment to others. The modern equipment of American and Continental used for making packer's cans has a speed of 500 cans a minute. In 1954, about 90 percent of Heekin's equipment had been acquired or built in the middle 1930's or prior thereto. In all its plants, the Company had 37 can-making lines, 11 of which were very old and still hand operated. The new packer's can equipment Heekin was able to purchase after the war from Bliss and Baldwin-Lima-Hamilton was able to attain a speed of but 400 cans a minute, and could attain such speed only with difficulty. The remainder of Heekin's packer's can equipment could generate speeds only up to 300 cans per minute. Heekin is in direct competition with American, Continental and Pacific.

30. About 50 percent of Heekin's total production consisted of packer's cans, the type wherein Heekin's largest competitors had the advantage of more efficient equipment, as hereinabove set forth. The remainder consisted of general line cans, a type of can which is produced, both by Heekin as well as its competitors, on semiautomatic lines. Although Heekin's semiautomatic equipment was also not modern, its disadvantage with respect thereto was not as great as with the packer's cans, since the semiautomatic equipment does not lend itself as readily to the speed and automation required with respect to packer's cans. Heekin's semiautomatic lines were capable of producing approximately 300 cans a minute.

31. The can-making business is primarily a material-handling one. It involves a rapid and efficient flow of a large amount of materials through a plant, from the receipt of raw materials to the shipment of finished products. Accordingly, multistory buildings are less efficient than single-story buildings, where material can be freely moved with such equipment as fork-lift trucks and conveyors. Heekin's Cincinnati and Norwood plants, its two largest, are multistory buildings, while its Springdale, Blytheville and Chestnut Hill plants are single story. The Cincinnati plant (which also serves as the Company's headquarters) with six stories, and the Norwood plant, with four, use elevators for the vertical movement of materials, which necessitates excessive labor and handling costs and tends to make production control more difficult. These two plants accounted for approximately 75 percent of the Company's total sales volume in 1954, the Cincinnati plant accounting for approximately 45 percent. The Springdale plant accounted for approximately 17 percent of such total volume, and the Chestnut Hill and Blytheville plants together accounted for approximately 8 percent of the Company's 1954 sales.

32. Heekin has a dock on the Ohio River in Cincinnati, permitting it to take advantage of inexpensive water transportation of steel shipped down the river from Pittsburgh, Pennsylvania. Thus, Heekin has an advantage on freight costs for its raw material over some of its competitors in the same area who receive their raw materials by rail. However, some can manufacturers are located adjacent to or in the vicinity of the steel mills from which they obtain

their raw materials, and, consequently, pay little or no freight at all.

33. As of the 1954 valuation dates herein involved, there was no indication that the Company would not continue in business for the foreseeable future. During the year 1954, the Company acquired not less than $309,650 in new assets, of which $280,610 was in machinery, fixtures and dies, and $23,447 in seamer machinery and equipment. The indications were that its performance would continue to be at least equal to that of the past 2–3 years, during which operations were on a substantially normal basis. Prior to August 3, 1954, the Hamilton Metal Products Company, one of the Company's important customers, and for whom Heekin manufactured the Skotch Kooler and Grill, had advised the Company of Hamilton's need for certain new products, and on that date the Company, by unanimous vote of its board of directors, authorized the expenditure of approximately $90,000 for new tooling and equipment at its Cincinnati plant for the manufacture of said products. Also prior to that date, the Company had investigated the desirability of entering into the manufacture of beer cans, and, again by the unanimous vote of its board of directors at said meeting, there was authorized the expenditure of approximately $650,000 for new tooling, machinery and equipment at the Norwood plant for the manufacture of such cans. The Company was fully cognizant of the need of modernizing its Norwood and Cincinnati plants and equipment. In 1953, it engaged an engineering firm to make a survey and develop costs for an efficient one-story plant to replace these two multistoried plants. However, this firm's report to the Company had not been completed prior to October 25, 1954.

34. In 1954 no other company in the Cincinnati area was engaged in the production of beer cans. Heekin decided to enter this field because it would have a freight advantage over American and Continental plants outside the Cincinnati area. Thus, the brewers of the Cincinnati area could be served more economically by Heekin. Heekin thus anticipated that the venture would be a profitable one. Accordingly, in August 1954, Heekin hired a man from Continental and, as set forth above, appropriated money for this program. No beer cans were, however, manufactured in 1954.

35. In 1954 the domination of the industry by American and Continental was such that they made about 75 percent of the total can sales in the country. Three other can manufacturing companies, the National Can Corporation, the Pacific Can Company, and Crown Cork & Seal Co., Inc., together made about 8 percent of the sales. Heekin did a little less than 1 percent of the total business. In that year American's sales were about $652,000,000, Continental's about $616,000,000, and Heekin's about $16,300,000. American had 76 plants in operation, Continental had 40, and Heekin had 5. The prices in the can-making industry are in effect established by American and Continental. When they announce prices, Heekin goes up or down with them. Heekin competes with American and Continental in its trade area. In addition, National has a plant in Hamilton, Ohio, and Crown a plant in Chicago.

36. On June 22, 1950, the United States District Court for the Northern District of California, Southern Division, in a civil action entitled United States of America v. American Can Company, entered an order adopting its opinion of November 10, 1949, 87 F.Supp. 18, which found and adjudged the American Can Company to have violated the Sherman Anti-Trust Act and the Clayton Act, 15 U.S.C.A. §§ 1–7, 12 et seq. By such order, American was enjoined from continuing certain practices, including the practice of requiring that lessees of certain American machines could not purchase for use in connection with such machines cans made or sold by anyone other than American, as well as from continuing certain quantity discount

practices. Thereafter, new areas of business with larger packers were to some extent opened up for Heekin, benefiting Heekin's business to some degree. Although Heekin cannot compete with the industry's giants on a price basis, Heekin often can, because it is smaller and closer knit, offer customers better personal service than its larger competitors.

37. During 1953 and 1954, conditions generally in the container and packaging industry, including the production of metal cans, were good, and demand was at a record level. The general business outlook in the industry was favorable, and can manufacturers were optimistic about the continuation of the high demand. These favorable conditions prevailed also in the Middle Atlantic States, which comprise Heekin's trade area.

38. Heekin's Norwood plant was first unionized in 1941. As of 1954, Heekin had fairly good relations with the Norwood plant employees. In 1950 the Cincinnati plant was unionized. Both plants were unionized tthroughout 1954. Heekin's other plants were not unionized.

39. Heekin encountered some labor trouble at the Cincinnati plant between 1950 and 1954. One of the factors contributing to such trouble was the higher wages paid by American Can. In 1952 Heekin was struck for 8 weeks. In 1953 there was a work stoppage of about a week, and in May 1954 of about 4 weeks. Heekin's union contracts were on a different time basis from most of the industry. Heekin's strikes, therefore, were usually at different times than its competitors. The industry as a whole, other than Heekin, was struck during the latter part of 1953, helping Heekin's 1953 earnings. However, 1954 earnings were somewhat depressed because of the 4-week strike in May of that year.

40. In 1954 Heekin's sales totaled approximately $16,355,000, of which six customers represented about $7,636,000. Relations with these major customers were excellent and in 1954 there was

every reason to believe they would continue to deal with Heekin. These customers included Bush Brothers & Company ($2,494,000), hereinabove mentioned; Hamilton Metal Products Company ($2,288,000), also mentioned above, and which was located only 25 miles from Cincinnati, with a consequent freight advantage to Heekin; and the Reynolds Tobacco Company ($1,403,000), with whom Heekin had been dealing since 1908.

41. In 1950 Heekin secured a $3,000,000 3¾ percent loan from New York Life Insurance Company, payable in annual installments through 1965 of $150,000 on principal, plus interest on the unpaid balance. In addition, there was required to be paid each year 20 percent of the net income of the Company (less $150,000) for the preceding year. Part of this loan was used to refinance a $1,000,000 loan from The Mutual Benefit Life Insurance Company of New York. $1,500,000 of the proceeds of the loan were paid to Weirton Steel Company to retire certain debts. The $500,000 balance was added to working capital. As of June 30, 1954, the net amount due on this long-term debt was $1,924,000, and as of September 30, 1954, such amount was $1,891,000. The Company has bank lines of credit for current borrowing. It did not have to rely on factoring its receivables. The Company has never engaged in public financing.

42. Prior to 1950, Heekin organized a wholly owned subsidiary, Canners Exchange, Inc., to finance small packers in the Ozark area, whose accounts were supposedly secured by sufficient collateral. In 1950 Heekin experienced substantial difficulties as a result of the activities of this subsidiary. After Albert E. Heekin, Jr., entered the management, company officials determined that much of the collateral taken by the subsidiary was of little value. Consequently, Heekin suffered a loss of more than $1,000,000. The discovery of this situation in the affairs of its subsidiary and the in-

currence of this large loss was made shortly after the aforementioned loan from New York Life Insurance Company had been negotiated. This situation strained Heekin's relations with this lender. New York Life required both Daniel M. Heekin, then the president, and Heekin's treasurer, to put up $35,000 and $10,000, repectively, from their personal funds to supplement Heekin's working capital. By 1954, however, this situation had been overcome. All losses arising from this activity had been written off through 1952. The personal funds advanced to supplement working capital had, with New York Life's consent, been withdrawn and the subsidiary had been liquidated.

43. (a) James Heekin, the founder of the Company, had a partner whose descendants hold minority interests in Heekin stock. In 1951, certain of these minority stockholders made arrangements through Albert E. Heekin, Albert E. Heekin, Jr., and the aforementioned Rolfes (finding 20), who was also Heekin's sales vice president, to sell certain of their holdings. Sales of this stock were made to Heekin employees and friends of the Heekin family. No attempt was made to sell the stock to the public on the open market. A total of 13,359 shares was sold in this manner during 1951 and early 1952 in 44 separate transactions, 35 of which took place in 1951, commencing March 22, and 9 in 1952, ending on April 16. The smallest amount sold in these transactions was 50 shares and the largest 1,400. About three-quarters of these transactions resulted from the liquidation of a block of 10,709 shares by one individual. All sales were for $7.50 per share, which by previous agreement was satisfactory to the sellers. This price was arranged during the time when Heekin was experiencing its difficulties with Canners Exchange, Inc., and during a period when the payment of dividends had been suspended by the Company. When the price was arranged, the Company's last annual financial report was for the year 1950. In 1950 Heekin had paid no dividends, the payment of its usual quarterly dividends at the annual rate of 50 cents per share having been omitted. Dividends were not resumed until August 1, 1951, with the payment of a quarterly dividend of 12½ cents a share.

In 1953, there was only one sale of Heekin stock, consisting of 100 shares by an employee of the Company who had purchased them in 1951, to another Heekin employee. In 1954, there was similarly only one sale of Heekin stock, consisting of 200 shares sold on August 6 to a Heekin employee by another employee who had also previously purchased this stock in 1951. These 1953 and 1954 sales were also on the basis of $7.50 a share.

(b) An analyst or investor attempting, as of the valuation dates herein involved, to determine the fair market value of Heekin stock would reasonably give only minimal weight to the above-mentioned sales. As shown, the predetermined price for the bulk of the sales occurred in 1951 during the difficult Canners Exchange episode and when the payment of dividends had been suspended. These sales were in point of time relatively remote from said 1954 valuation dates. Only one sale was made in 1953 and one in 1954. These isolated transactions would not be considered sufficient to establish a market price. Further, there is no indication that the $7.50 sales price of all these transactions evolved as a result of the usual factors taken into consideration by informed sellers and buyers dealing at arm's length.

44. The prospective earnings of a manufacturer type of corporation such as Heekin is normally the most important factor to be considered in determining the fair market value of its stock. One important element to consider in attempting to forecast such future earnings is the corporation's past earnings during a representative period which is brought up to a date as close to the valuation date as is possible. Further, the

later earnings during such period are the more important in that they reflect trend, and are therefore more likely to indicate future prospects than a simple average of past earnings throughout such period. In calculating such past earnings for the purpose in question, it is also important to consider and make appropriate adjustments for any abnormalities or nonrecurring items. In this manner, a picture of the past normal operations of the corporation is, insofar as is reasonably possible, reconstructed and then used as a more accurate basis for a forecast of the earnings that future operations of the corporation will generate on a presumed normal basis.

45. The Company's operations were audited and analyzed annually by a competent firm of certified public accountants which furnished financial statements, including balance sheets and profit and loss statements. Without adjustment, these financial statements indicated net profits after taxes as follows:

| Year | Amount |
|------|--------|
| 1950 | $34,806.71 |
| 1951 | 852,427.30 |
| 1952 | 422,414.11 |
| 1953 | 495,978.83 |
| 1954 | 335,929.17 |

Analysis of these profits indicate there were certain abnormalities therein, as follows:

(a) As indicated, the Company suffered abnormal, nonrecurring losses of over $1,000,000 on the Canners Exchange venture. These losses were completely liquidated by the end of 1952. Thus, the 1950–52 profits inclusive were charged with these losses. Over $570,000 of these losses were charged against 1950 profits alone.

(b) Despite a loss of almost $360,000 charged against 1951 profits because of the Canners Exchange venture, the Company's 1951 profits were abnormally large due to the effects of the Korean war. Because of the shortages during that period, created in part by can users building up their inventories, competitive conditions in the can manufacturing industry temporarily eased, resulting in a seller's market and permitting an increase in the Company's normal profit margin.

(c) Profits for 1950 and 1951 were overstated because of a noncontributory retirement plan instituted subsequent to 1951 for hourly employees, for which the costs attributable to 1950 and 1951 were borne in later years. In like manner, profits for 1952 through 1954 were abnormally depressed because a portion of the payments during these years was applicable to previous years. That portion of the 1952–54 cost of the plan applicable to earlier years was as follows:

| Year | Total payment | Applicable to other years |
|------|---------------|---------------------------|
| 1952 | $101,240 | $45,973 |
| 1953 | 114,357 | 61,540 |
| 1954 | 100,106 | 61,540 |

On the basis of these 1952–54 payments, a reasonable estimate of the expense of this plan attributable to 1951 and 1950 would be approximately $50,000 and $40,000, respectively.[2]

(d) Profits shown for 1954 were abnormally depressed additionally because (1) they reflected payment to the Government in 1954 of a renegotiation refund of $35,437.50 arising out of excess profits made in 1951 (the 1951 profits being therefore similarly overstated by

2. In June 1953 Heekin also instituted a contributory plan for salaried employees. However, the portion of the payments thereafter made for this plan which are attributable to earlier years cannot be determined. Payments for this plan in 1953 were $46,293, and in 1954, $45,367.-

73. The amount of decrease in 1950–52 profits and increase in 1953 and 1954 profits as a result of this situation are thus unavailable, nor can they be reasonably estimated. They would, however, be insignificant in the overall picture.

such amount), and (2) they are subjected to a charge of $174,203.54, which amounted to $83,617.70 after taxes, as a result of a deduction from 1954 profits only of both 1954 and 1955 expenses of such items as vacation pay, sales allowances and cash discounts. This abnormally large charge was permitted by a change in the tax laws which became effective in 1954 (Section 462 of the 1954 Internal Revenue Code) and which allowed a taxpayer such as Heekin to change this method of accounting so as to effect the accrual in 1954 of these 1955 expenses, thereby doubling up these types of expenses in 1954. The accrual of these 1955 expenses in the 1954 tax year was effected by a year-end book entry made after the valuation dates herein involved and was not reflected in Heekin's 1954 interim financial statements prepared prior to such dates.

46. The Company's interim financial statements which were available on August 3 and October 25, 1954, reflected net profits after taxes as follows:

6 months ended June 30, 1954.......... $218,606.47
9 months ended September 30, 1954.... 382,967.20

However, because the canning industry is a seasonal one, an entire year's operation as reflected by the Company's interim and annual statements, as hereinafter set forth, would give a more complete picture of profits than the results of 6 and 9 months operations.

47. (a) In accordance with the considerations set forth above concerning adjusting the past earnings records so as to eliminate or properly reflect the abnormalities and nonrecurring items hereinabove referred to, there are set forth below the adjusted profits of the Company for the years 1950 through June 30 and September 30, 1954, in accordance with such financial data as

3. This figure and the comparable ones for the subsequent years is taken from the Company's profit and loss statement. In this instance, the statement reflects this figure prior to a subsequent "Provision for Loss on Investments in and Receivables

were available at the valuation dates herein involved. The reasonably accurate method adopted for the purpose of recomputing what the earnings would have been without such abnormalities and nonrecurring items is to calculate, on the basis of the Company's sales and other income, less its costs and operating expenses, what its pretax profits were and then to make the adjustments. Because the interim statements hereinabove referred to for the 6 and 9 months periods in 1954 may not allow for seasonal changes in the canning industry, the latest 12-month periods based on interim and annual statements are used.

(b) *For the Calendar Year 1950*

| | |
|---|---|
| Sales | $12,099,267.25 |
| Pretax Profit [3] | 706,989.10 |
| Applicable Retirement Fund Expense.... | 40,000.00 |
| Adjusted Pretax Profit | 666,989.10 |
| Federal Income Tax—Recomputed [4] | 341,334.33 |
| Adjusted Net Profit | 325,654.77 |

For this year, the loss of $573,880.74 charged by the Company on account of the Canners Exchange operation has been eliminated, and the retirement expense hereinabove referred to properly applicable to this year's operations has been charged against profits.

(c) *For the Calendar Year 1951*

| | |
|---|---|
| Sales | $15,040,705.83 |
| Pretax Profit | 1,714,131.44 |
| Applicable Retirement Fund Expense ... | 50,000.00 |
| Adjusted Pretax Profit | 1,664,131.44 |
| Federal Income Tax—Recomputed | 859,848.34 |
| | 804,283.10 |
| Renegotiation Refund | 35,437.50 |
| | 768,845.60 |
| Adjustment to eliminate abnormally high profits due to Korean war | 347,254.62 |
| Adjusted Net Profit | 421,590.98 |

As for the previous year, the loss of $358,272.72 charged by the Company to this year's operations on account of the Canners Exchange operation has been

from Subsidiary Companies" in said amount of $573,880.74.

4. This is estimated at $5,500 less than 52 percent of pretax profit.

eliminated, and the retirement fund expense properly applicable to the year's operations has been charged against profits. In addition, since 1951 net income was, as hereinabove noted, abnormally high due to the Korean conflict, it becomes necessary to adjust the profit to a more normal level if a reasonable comparison with other years' operations is to be obtained. A reasonable method of properly adjusting 1951 profits so as to be in line with the Company's normal operations would be to compute the Company's average profit (as adjusted) as a percent of sales for 1950, 1952, 1953, and the portions of 1954 herein involved (6 and 9 months) and to apply the same percentage to 1951 sales. The average profit as a percent of sales for the other 3½ and 3¾ years was 2.803. The application of such percentage figure to 1951 sales gives an adjusted net profit of $421,590.98, thus causing the elimination from the aforementioned $768,845.60 adjusted net profit figure the sum of $347,254.62 as excessive profits due to the Korean war.

### (d) *For the Calendar Year 1952*

| | |
|---|---|
| Sales | $14,571,742.65 |
| Pretax Profit | 583,714.65 |
| Retirement Expense Overcharge | 45,973.00 |
| Adjusted Pretax Profit | 629,687.65 |
| Federal Income Tax—Recomputed | 321,937.58 |
| Adjusted Net Profit | 307,750.07 |

For this year, the loss of $46,788.19 charged by the Company on account of the Canners Exchange operation has been eliminated and the retirement expense charged to 1952 operations but which was applicable to prior years, as hereinabove explained, has been added to 1952 profits.

### (e) *For the Calendar Year 1953*

| | |
|---|---|
| Sales | $17,018,346.54 |
| Pretax Profit | 1,066,668.40 |
| Retirement Expense Overcharge | 61,540.00 |
| Adjusted Pretax Profit | 1,128,208.40 |
| Federal Income Tax—Recomputed | 581,168 37 |
| Adjusted Net Profit | 547,040.03 |

The only adjustment for this year is the retirement expense charged to 1953 operations but which was applicable to prior years, as hereinabove explained. This overcharge has been added to 1953 profits.

### (f) *For the 12 months ended June 30, 1954*

| | |
|---|---|
| Sales | $17,939,205.05 |
| Pretax Profit | 1,179,195.74 |
| Retirement Expense Overcharge | 61,540.00 |
| Renegotiation Charge Applicable to 1951.. | ⁵36,000.00 |
| Adjusted Pretax Profits | 1,276,735.74 |
| Federal Income Tax—Recomputed | 658,402.57 |
| Adjusted Net Profit | 618,333.17 |

### (g) *For the 12 months ended September 30, 1954*

| | |
|---|---|
| Sales | $17,267,183.68 |
| Pretax Profit | 948,708.04 |
| Retirement Expense Overcharge | 61,540.00 |
| Renegotiation Charge Applicable to 1951.. | 35,437.50 |
| Adjusted Pretax Profit | 1,045,685.54 |
| Federal Income Tax—Recomputed | 538.256.48 |
| Adjusted Net Profit | 507,429.06 |

(h) On the above bases, the following is a summary of the adjusted net profit of the Company for the periods indicated:

| *Year* | *Adjusted net profit* |
|---|---|
| 1950 | $325,654.77 |
| 1951 | 421,590.98 |
| 1952 | 307,750.07 |
| 1953 | 547,040.03 |
| 12 months ending June 30, 1954 | 618,333.17 |
| 12 months ending Sept. 30, 1954 | 507,429.06 |

Thus, the Company's adjusted earnings over the 4½ and 4¾ periods prior to the valuation dates herein involved were generally in a favorable upward trend.

48. (a) Since past earnings are analyzed only as a guide to forecasting future earnings, the later earnings in the past period examined are the more important. The future prospects of a company whose earnings have been growing consistently for 5 years would be better than the prospects of a company whose earnings have been diminishing for those

---

**5.** The Company's Financial Statement for the 6 months ended June 30, 1954, carried this amount as a "Provision for Renegotiation Refund for 1951." The amount actually paid prior to September 30, 1954, was, as previously mentioned, $35,437.50.

5 years, even though the average earnings for each company over this 5-year period may be the same. This growth trend in earnings would favor a higher valuation for the company showing such growth. A reasonable method of forecasting, as of the valuation dates herein involved, Heekin's prospective yearly earnings, giving increased weight to these later earnings, and yet giving appropriate consideration to all earnings (as adjusted) during the last 4½ and 4¾ years for the Company would be as follows:

| Unit of weight | Year | Adjusted earnings | Weighted value as of June 30, 1954 | Weighted value as of Sept. 30, 1954 |
|---|---|---|---|---|
| 1 | 1950............................................ | $325,654.77 | $325,654.77 | $325,654.77 |
| 2 | 1951............................................ | 421,590.98 | 843,181.96 | 843,181.96 |
| 3 | 1952............................................ | 307,750.07 | 923,250.21 | 923,250.21 |
| 4 | 1953............................................ | 547,040.03 | 2,188,160.12 | 2,188,160.12 |
| 5 | 12 months ending June 30, 1954................ | 618,333.17 | 3,091,665.85 | .............. |
| 5 | 12 months ending September 30, 1954.......... | 507,429.06 | .............. | 2,537,145.30 |
| | Total.................................... | .............. | 7,371,912.91 | 6,817,392.36 |

Upon dividing these weighted totals by the total units of weight (15), a value of representative average annual earnings is obtained of $491,460.86 as of June 30, 1954, and $454,492.82 as of September 30, 1954. As of such dates, it could be reasonably expected that such amounts would be the approximate annual earnings that would result from the Company's normal operations for a reasonable period in the future.

(b) On the above basis, Heekin's reasonably expected annual earnings per share would, as of June 30, 1954, be $1.93 and, as of September 30, 1954, $1.79.

49. (a) Although some investors may care little about the receipt of dividends, while others may depend upon them and therefore give them greater significance, the amount of dividends which a stock is likely to yield, as a result of its dividend-paying capacity or corporate policy, is normally considered to be an important factor in determining its fair market value. As with earnings, the forecast of future dividends is generally based to a large extent upon the past dividend record of the stock.

(b) On August 3 and October 25, 1954, Heekin's annual dividend yield was 50 cents a share. Heekin paid such annual dividends each year since 1945 except for the 1½-year period of 1950 and the first half of 1951 when, as previously shown, dividends were suspended. This was the period during which Heekin experienced substantial losses in connection with the operations of Canners Exchange. In view of this abnormal loss and the terms of its loan agreement with the New York Life Insurance Company, Heekin's surplus was restricted so that as of December 31, 1950, only $30,386.81 was available for dividend distribution. In August 1951, however, the Company, as a result of the large profits it was making due to the effects of the Korean war, felt it could resume its 50-cent annual dividend payments in the form of 12½ cents quarterly distributions.

As of December 31, 1953, the restriction imposed by the loan agreement (finding 41) left $840,444.78 available for dividends, which was equivalent to more than $3 a share. As of August 3 and October 25, 1954, therefore, this restriction placed no real burden on the normal 50-cent annual dividend. Consequently, Heekin's demonstrated earning capability and financial position were such that in August and October 1954 it

could reasonably be anticipated that Heekin would continue its 50-cent annual dividend. On this basis, Heekin's expected dividend payments would amount to approximately 25 percent of its reasonably expected earnings as of those dates. The general tendency is for publicly held companies to pay out a greater percentage of their earnings in dividends than privately held companies.

(c) Although, considering only its prospective earnings, the prospective dividend rate would appear to be a conservative one, no significant increase in such rate for some time to come could have reasonably been anticipated on the valuation dates. As shown, the bulk of Heekin's equipment was not modern, and the Company was in need of relatively large sums for modernization of equipment and plant if it hoped to continue to be a competitive factor in the industry. The Company would have to depend primarily on retained earnings for such a program. A further limitation on the Company's dividend-paying capacity was the requirement of its loan agreement covering its long-term indebtedness, which called for annual payments of $150,000 upon principal plus such amount as was owing as a result of applying the 20 percent formula. Such payments were not tax deductible and could be made only out of earnings after payment of income taxes, if paid out of earnings at all. Thus, these demands upon earnings would restrict the Company's dividend-paying capacity to such an extent that it could not reasonably be anticipated that the 50-cent annual rate would be increased to any substantial extent.

50. In the evaluation of the worth of a stock, it is recognized that the so-called "book value" of the stock is an important consideration, although there are considerable differences of opinion concerning the weight to be given this factor in the overall analysis. Book value is determined by ascertaining the corporation's net worth (assets less liabilities) and then dividing such worth by the number of shares outstanding. It indicates how much of the Company's net assets valued as a going concern is applicable to each share. The corporation's net worth is normally ascertained from its balance sheet. Some of the differences in opinion as to the relative weight to be given the factor of book value arise from the recognized fact that, absent a sale of the corporation or a merger or consolidation, "book value" could not be translated into realization except in the event of liquidation, and that in such event many of the assets reflected in the balance sheet, such as equipment and inventory, could not be sold at their stated values, which are based upon their going concern and not their liquidation value. In this connection, therefore, the factor of "current assets," such as cash and accounts receivable, is given special attention because in the event of a liquidation, their stated value would not normally be materially affected. However, in the event of a sale, merger, or consolidation (although there was no prospect of such on the valuation dates with respect to Heekin), an ascertainment of the Company's net worth and the resulting book value of the outstanding stock is often of primary importance in the determination of the price to be paid for, or the value to be placed upon, such stock. Further in this connection there is normally considered the soundness of the company's financial condition as reflected by its current asset and current liability position.

51. On the pertinent gift dates, Heekin was in a current sound financial condition. Its balance sheet as of June 30, 1954, showed the following:

### ASSETS
#### CURRENT ASSETS

| | | |
|---|---:|---:|
| Cash | | $1,942,469.64 |
| Notes and Accounts Receivable | $2,176,025.13 | |
| Less: reserve for doubtful accounts | 131,043.19 | |
| Net notes and accounts receivable | | 2,044,981.94 |
| Mortgage notes receivable—current portion | | 46,000.00 |
| Inventories at lower of cost or market: | | |
| Raw Materials and Supplies | 2,271,681.81 | |
| Goods in process and finished products | 2,391,172.72 | |
| Total inventories | | 4,662,854.53 |
| Total current assets | | $8,696,306.11 |

#### OTHER ASSETS

| | | |
|---|---:|---:|
| Notes receivable—portion not current | | 127,008.97 |
| Investments—at cost: | | |
| Stocks and bonds | 335,829.11 | |
| Less reserve for losses | 25,000.00 | |
| Investments—net | | 310,829.11 |
| Property, plant and equipment—at cost | 8,948,515.48 | |
| Less reserve for depreciation | 5,040,107.53 | |
| Property, plant and equipment—net | | 3,908,407.95 |
| Deferred charges | | 113,041.21 |
| Total assets | | $13,155,593.35 |

### LIABILITIES
#### CURRENT LIABILITIES

| | | |
|---|---:|---:|
| Notes payable—current portion of long-term debt | $163,000.00 | |
| Trade acceptances and accounts payable | 1,826,021.67 | |
| Accrued accounts | 749,625.39 | |
| Total current liabilities | | $2,738,647.06 |

#### OTHER LIABILITIES

| | | |
|---|---:|---:|
| Long-term debt, less current portion | 1,924,000.00 | |
| Deferred rental income | 33,494.97 | |
| Reserve for workmen's compensation insurance | 35,825.45 | |
| | | 1,993,320.42 |
| Total liabilities | | 4,731,967.48 |
| Capital stock, 254,125 shares issued—stated value | 1,569,596.00 | |
| Earned surplus | 6,854,029.87 | |
| Total net worth | | 8,423,625.87 |
| Total liabilities and net worth | | $13,155,593.35 |

Thus, its current assets alone, amounting to almost $8,700,000, far exceeded its total liabilities of approximately $4,732,000, including its long-term debt to New York Life. Its ratio of current assets to current liabilities was 3.17 to 1.

There was no significant change in the Company's financial condition reflected in its September 30, 1954, balance sheet.

52. The values used in the foregoing balance sheet reflect inventory at the lower of cost or market. No provision was made for reserve for obsolescence in inventory because it was not considered that there was any such obsolescence. The plant, property and equipment were carried on the balance sheet at acquisition cost less depreciation despite the acquisition of the Cincinnati and Norwood plants as long ago as 1908 and 1917, respectively, and the subsequent rise in real estate values throughout the years. The reserve for doubtful accounts was increased substantially at the end of 1953 after a detailed analysis of the notes and accounts receivable outstanding as of December 31, 1953. Despite the possibility

that certain bonds included in the "Investments" entry may have been somewhat overvalued, the balance sheet as above set forth generally represents a conservative approach and fairly presents the Company's financial condition. Without making any adjustments either upward or downward in the assets or liabilities shown therein, it reasonably reflects the net worth of the Company as of June 30, 1954.

53. On the basis of the balance sheet figures set forth above, the book value for each share of the Company's 254,125 shares of common stock outstanding was $33.15 on June 30, 1954. On the similar basis of the Company's balance sheet figures for September 30, 1954, the book value of each share of its stock on September 30, 1954, was $33.54.

54. In ascertaining the fair market value of the stock of a closely held corporation, a reasonable guide, frequently employed by analysts and investors, is to consider the relationship that the market prices of actively traded stocks of companies in the same or closely similar lines of business bear to their earnings, dividends, and book values. In this manner, some indication may be obtained concerning the relative weights accorded by the investing public to these factors in the fixing of a fair market value. Such similar enterprises are normally affected by the same general economic factors as the stock being valued.

55. As of the valuation dates, can manufacturing companies in all respects comparable to Heekin did not exist. Such giants in the industry as American Can and Continental Can are so much larger, and had diversified into so many other products and other types of containers, such as fiber and plastic, as to disqualify them as reasonable comparables. Since eliminations based on such considerations would leave so few can manufacturing companies to compare with Heekin, some manufacturers of glass containers may reasonably be considered as appropriate comparatives. The long-term sales trends of can and glass container manufacturers are fairly parallel. The glass container companies are in competition with the can companies and are affected by similar economic factors. However, other companies in the packaging area, such as manufacturers of corrugated containers, are less desirable for comparative purposes because they are not as closely competitive with can companies and their pattern of long-term growth has been dissimilar to that of the can companies.

56. In both the can and glass container manufacturing fields, the large and highly diversified companies are considered of greater value by investors, and the stocks of such companies sell higher on the basis of such factors as earnings, dividends, and book value than those of the smaller, less diversified competitors. For this reason, American Can and Continental Can, the two largest can manufacturers, are, as noted, not fairly comparable with Heekin. For the same reason, Owens Illinois Glass Company, the largest glass container manufacturer, is also not reasonably comparable. Similarly, Hazel Atlas Glass Company, the industry's second largest glass container manufacturer, which is also well diversified in other lines, and the Crown Cork & Seal Company, which manufactures cans (40 percent of total production) but is also well diversified, with its principal business being the manufacture of bottle caps and bottling machinery, are to a large extent not comparable.

57. The following companies, despite certain differences and factors which make them less than ideal comparatives, may reasonably be considered as bearing such sufficient fundamental similarities to Heekin as to warrant their use as comparables for the purpose herein involved:

(1) *Pacific Can Company* manufactured plain, lithographed and lacquered cans, as well as other metal containers. Like Heekin, it made general line cans although its packer's cans were more important. This company designed, built and serviced its own can-making equipment. Its annual sales for the 4½-year period prior to June 30, 1954, averaged approximately $23,500,000.

(2) *United Can and Glass Company* manufactured cans and glass containers. It was a large supplier of the requirements of Hunt Foods, Inc., which owned a controlling interest in it. General line cans represented a small portion of its total can output, packer's cans being its primary can production. Its glass containers were largely for food and dairy products, for which products Heekin also manufactured metal containers. This company too manufactured its own can-making equipment and also manufactured peach-pitting machinery. Its annual sales for the 4-year period prior to June 30, 1954, averaged approximately $15,000,000.

(3) *National Can Corporation* was primarily a manufacturer of cans, metal containers, and housewares. From the standpoint of the nature of its business, it is thus an excellent comparable. Its annual sales for the 4½-year period prior to June 30, 1954, averaged approximately $32,500,000. However, other factors make this company less desirable as a comparative. During the pertinent period its earnings fluctuated more erratically than those of other can or glass container companies. In 1952 it suffered a large loss which could reasonably be considered to be of a nonrecurring nature. In addition, it experienced changes in management in early 1953 and at the same time acquired another can company.[6] Nevertheless, considering the closely similar nature of its business, and

because of the paucity in the number of comparables available, National's use as a comparable is justified if certain adjustments are made in its erratic earnings record in order to arrive at figures which could be considered as being more normal. Such adjustments are hereinafter made. As noted, Heekin too suffered a large nonrecurring loss, for which appropriate adjustments, as set forth above, are made in computing its more normal earnings, and Heekin also had a change in management affecting operations in the years immediately preceding 1954.

(4) *Brockway Glass Co., Inc.* made a general line of glass containers, including food and Mason jars. Its annual sales for the 5-year period 1949–1953 averaged approximately $13,300,000. However, each year's sales during this period increased, with sales in 1953 totaling approximately $21,000,000.

(5) *Thatcher Glass Manufacturing Co., Inc.* was one of the principal manufacturers of glass containers. Its products included bottles and containers of all types for food, beverages and chemicals. Its annual sales for the 4-year period prior to June 30, 1954, averaged approximately $23,500,000.

58. The adjusted earnings on the common stock of the above five companies for the years 1950 through 1953 and for the 12-month periods ending June 30 and September 30, 1954, are as follows:

| Year | Brockway Glass | Pacific Can | Thatcher Glass | United Can | National Can |
|---|---|---|---|---|---|
| 1950 | $602,000 | $562,000 | $446,500 | $715,000 | $303,000 |
| 1951 | 603,000 | 850,000 | 1,179,000 | 954,000 | 618,000 |
| 1952 | 520,000 | 743,000 | 630,000 | 737,000 | 475,000 |
| 1953 | 623,000 | 965,000 | 974,000 | 511,000 | 1,205,000 |
| 12 months ending June 30, 1954 | *912,500 | *1,076,000 | 1,035,000 | *693,000 | 1,039,000 |
| 12 months ending Sept. 30, 1954 | *1,057,250 | *1,131,500 | 941,000 | *784,000 | 891,000 |

---

6. Because of its earnings' irregularities and the special conditions described, the only plaintiffs' expert who made a detailed analysis of his selection of comparable companies and the consideration he gave them, as well as the defendant's expert, both excluded this company as a comparable.

* Interim profit unavailable. Profit at June 30, 1954 computed as one-half of 1953 earnings and one-half of 1954 earnings.

These earnings reflect the following adjustments:

(1) Thatcher's reported profits for 1950–52 included large nonrecurring items, primarily for gain or loss on sale of equipment. These items have been eliminated in order to reflect the company's more normal earnings.

(2) United's 1950 and 1951 profits have been adjusted to exclude a $130,000 nonrecurring gain in 1950 and a $218,000 nonrecurring loss in 1951.

(3) National suffered unusual losses in 1952 and incurred a deficit of approximately $1,475,000. The major reasons for the deficit (a strike and costly litigation) were at least largely of nonrecurring character. The profits of container manufacturers were somewhat depressed in 1952. This followed the generally unusually good results of 1951 for can manufacturers due to the Korean conflict, as hereinabove set forth. Orders in 1951 were high due to customers' building up inventory. The effects of the 1951 inventory build-up was, however, felt in 1952, when orders decreased. Had National's situation been more normal in 1952 and had it not suffered the nonrecurring types of losses referred to, it would be reasonably assumed, based on the earnings of other container manufacturers during that year and the relationship that such year's earnings bore to 1951 earnings, that National's profit for 1952 would have been approximately $475,000.

59. Using the same technique as was adopted with respect to Heekin, and giving greater weight to the earnings of the later periods of time, in order to give proper consideration to the factor of trend, the reasonably anticipated annual earnings of the above-mentioned five companies selected as comparables, would, as of June 30 and September 30, 1954, be as follows:

| 12 months ending— | Brockway Glass | Pacific Can | Thatcher Glass | United Can | National Can |
|---|---|---|---|---|---|
| *1954* | | | | | |
| June 30 | $694,833 | $915,400 | $917,700 | $689,533 | $865,267 |
| Sept. 30 | 743,083 | 933,900 | 886,367 | 719,867 | 815,933 |

60. The market prices of the common stock of the five comparable companies on the applicable dates were as follows:

| | Price Aug. 3, 1954 | Price Oct. 25, 1954 |
|---|---|---|
| Brockway Glass | $50 | $49 |
| Pacific Can | 21⅝ | ⁷ 25⅞ |
| Thatcher Glass | 18 | 15⅝ |
| United Can and Glass | 13 | 13½ |
| National Can | 13¾ | 13⅞ |

Profit at September 30, 1954 computed as one-fourth of 1953 earnings and three-fourths of 1954 earnings.

7. The sharp rise in price in ths stock resulted from the then pendng negotiations for the merger of Pacific Can with National Can. This special circumstance weakens its use as a comparable on this date and warrants consideration of this factor in the ultimate determination of a fair market price of the Heekin stock.

61. Earnings per share of the common stock of the five comparable companies, based on representative annual earnings as similarly computed for Heekin, were as follows:

| | Number of shares common stock outstanding | Earnings per share Aug. 3, 1954 | Earnings per share Oct. 25, 1954 |
|---|---|---|---|
| Brockway Glass | 65,219 | $10.65 | $11.39 |
| Pacific Can | 463,050 | 1.98 | 2.02 |
| Thatcher Glass | { 495,303 | 1.85 | |
| | { 535,303 | | 1.66 |
| United Can and Glass | 438,543 | 1.57 | 1.64 |
| National Can | 859,584 | 1.01 | .95 |

62. The market prices of the five comparable companies bear the following ratios to the above computed annual earnings per share of common stock:

| | Price-earnings ratio Aug. 3, 1954 | Price-earnings ratio Oct. 25, 1954 |
|---|---|---|
| Brockway Glass | 4.69:1 | 4.30:1 |
| Pacific Can | 10.92:1 | 12.81:1 |
| Thatcher Glass | 9.73:1 | 9.26:1 |
| United Can and Glass | 8.28:1 | 8.23:1 |
| National Can | 13.61:1 | 14.61:1 |

Such ratio is commonly referred to as the "price-earnings ratio." The average price-earnings ratio for the above companies was 9.45 to 1 on August 3, 1954, and 9.84 to 1 on October 25, 1954.

63. On the basis of the earnings alone, as hereinabove computed, Heekin's stock would, as compared with the above five companies, and assuming Heekin's stock was similarly listed on a national stock exchange and was actively traded, be priced at $18.24 a share on August 3, 1954, and at $17.61 a share on October 25, 1954.

64. (a) Dividend payments for the 12 months ending June 30, 1954, and September 30, 1954,[8] reflect the following rates of yield on the common stock of the five comparable companies based on their market prices on such dates:

| | Percent yield June 30, 1954 | Percent yield Sept. 30, 1954 |
|---|---|---|
| Brockway Glass | 5.61 | 5.93 |
| Pacific Can | 2.78 | 2 32 |
| Thatcher Glass | 5.66 | 6.19 |
| United Can and Glass | 3.43 | 3.37 |
| National Can | 0 | * 0 |

8. Dividends for the 12 months ending June 30, 1954, computed as one-half of 1953 and one-half of 1954 dividends. For the 12-month period ending September 30, 1954, the dividends are computed as one-fourth of 1953 and three-fourths of 1954 dividends.

9. National Can paid no dividends after its large 1952 deficit. Its use as a compara-

The average percent yield for these companies was 3.50 as of June 30, 1954, and 3.56 as of September 30, 1954.

(b) For the years 1951 through 1954, United Can and Glass paid a 5 percent stock dividend in addition to a cash dividend. While stock dividends do not result in any increase by a stockholder in his percent of ownership in the corporation, and do not afford any actual cash yield, investors do commonly consider them to be of some value, a consideration which frequently is reflected in the market price of the stock. However, stock dividends are normally not considered as valuable as cash dividends. The appraisal of the value of a stock dividend would differ depending upon the company concerned. A reasonable approximation for the purpose herein involved would be to consider the 5 percent stock dividend for this particular company as being worth approximately 25 percent as much as a cash dividend. On this basis, United's 5 percent stock dividend would be considered equivalent to a 1¼ percent cash dividend, and has been so treated in the above computation.

65. On the sole basis of the average of the latest 12 months dividends of the above five companies (as hereinabove computed) as compared with Heekin (and again assuming Heekin's stock would have equally wide access to the investing public), the market price of Heekin's stock on August 3, 1954, would, on the basis of Heekin's 50-cent annual dividend payment, be $14.29 a share, and on October 25, 1954, $14.05 a share. These prices would produce the dividend percentage yields of 3.50 and 3.56 above referred to.

66. The book value of the common stock of the above five companies as of June 30 and September 30, 1954, and its relation to market price on August 3 and October 25, 1954, were as follows:

*As of June 30, 1954*

|  | Book value June 30, 1954 | Price Aug. 3, 1954 | Price as a percentage of book value |
|---|---|---|---|
| Brockway Glass * | $93.99 | $50 | $53.20 |
| Pacific Can * | 18.05 | 21⅝ | 119.81 |
| Thatcher Glass | 18.66 | 18 | 96.46 |
| United Can and Glass | 16.55 | 13 | 78.55 |
| National Can | 19.16 | 13¾ | 71.76 |

Thus, on August 3, 1954, the average market price was 83.96 percent of book value.

*As of September 30, 1954*

|  | Book value Sept. 30, 1954 | Price Oct. 25, 1954 | Price as a percentage of book value |
|---|---|---|---|
| Brockway Glass * | $97.85 | $49 | $50.01 |
| Pacific Can * | 18.44 | 25⅞ | 140.32 |
| Thatcher Glass | 17.39 | 15⅜ | 88.41 |
| L.   u.   ·n and Glass | 16.98 | 13½ | 79.51 |
| National Can | 18.83 | 13⅞ | 73.69 |

ble for this purpose is thus weakened, and warrants consideration of this factor in the ultimate determination of a fair market price of the Heekin stock.

* Interim book value for Brockway Glass and Pacific Can was not available. Therefore, book value on June 30, 1954, was computed as one-half of 1953 year-end

Thus, on October 25, 1954, the average market price was 86.39 percent of book value.

67. On the sole basis of the average relationship that the book value of the common stock of the above five companies bore to their market prices, Heekin's comparable market price would be $27.83 on August 3, 1954, and $28.98 on October 25, 1954 (again assuming active trading in Heekin's stock).

68. As hereinabove set forth, earnings are normally the most important factor in the determination of the fair market price of a stock, and this is particularly true when they indicate trends and, therefore, future prospects. Dividend yield and book value are also important factors in such determination. In evaluating the Heekin stock, it would be reasonable, insofar as strictly statis-

tical considerations are concerned, to confine the determinants to these three factors. In valuations of this kind, it is, after the selection of the value determinants, common practice to consider the relative importance or weight to be given each one. Although analysts and investors differ in such appraisal, a reasonable conclusion of their relative importance in Heekin's situation would be to consider earnings as contributing approximately 50 percent to the total determination, dividend yield, as the second most important factor, as contributing approximately 30 percent, and book value, as the least important of the three, as contributing approximately 20 percent.

69. On the bases set forth in finding 68, the fair market value of Heekin stock on the pertinent gift dates, would, were it an actively traded stock, be as follows:

|  | Aug. 3, 1954 | Oct. 25, 1954 |
|---|---|---|
| Earnings (finding 63): | | |
| ($18.24 × 50%) | $9.12 | |
| ($17.61 × 50%) | | $8.81 |
| Dividend yield (finding 65): | | |
| ($14.29 × 30%) | 4.29 | |
| ($14.05 × 30%) | | 4.22 |
| Book value (finding 67): | | |
| ($27.83 × 20%) | 5.57 | |
| ($28.98 × 20%) | | 5.80 |
| Fair market value | 18.98 | 18.83 |

70. (a) As hereinabove noted, Heekin stock was for the most part closely held. It was not listed on any stock exchange and trading in it was infrequent. As shown by finding 43, there was only one transaction involving 100 shares in the entire year 1953, and only one involving 200 shares in the entire year 1954. Consequently, the stock lacked marketability. A closely held stock of such a corporation as Heekin which lacks marketability is less attractive to investors than a similar stock which has

ready access to the general public, a consideration which affects the market value of Heekin stock. This is especially true when, as here, each block of stock involved in the gifts made on each valuation date represented only a minority interest, as distinguished from the situation where a block of stock large enough to give a purchaser control of the corporation is offered. Such control of a profitable, going, concern represents an added element of value to a block of stock.

book value, and one-half of 1954 year-end book value. Book value on September 30, 1954, was computed as one-fourth of 1953

year-end book value and three-fourths of 1954 year-end book value.

(b) One reasonable method sometimes employed to determine the diminution in value attributable to a stock's lack of marketability is to determine how much it would cost to create marketability for the stock. Had Albert E. Heekin sold the 30,000 shares which were the subject of his gifts on August 3, 1954 through a public underwriting at the gross sales price of $18.98 a share, referred to in finding 69, the underwriter's compensation and other expenses would have amounted to approximately $2.31 a share. Similarly, had James J. Heekin sold the 40,002 shares which were the subject of his gifts on October 25, 1954 through such a public underwriting at the gross sales price of $18.83 a share also referred to in said finding, the underwriter's compensation and expenses would have amounted to approximately $2.29 a share. The reduction from the gross sales prices in both cases would amount to 12.17 percent. The net proceeds would thus have been $16.67 a share on the 30,000 shares given by Albert E. Heekin on August 3, 1954 and $16.54 a share on the 40,002 shares given by James J. Heekin on October 25, 1954.

71. (a) Considering all the facts and circumstances as herein set forth, the fair market value of the 30,000 and 40,002 shares which were the subject of the gifts on August 3 and October 25, 1954 was $15.50 a share.

(b) Although the market for stocks of the can and glass container manufacturing companies fell somewhat between August 3 and October 25, 1954, so that ordinarily a slightly lower value would be justified as of the latter date, the brightened prospects for increased business and profits resulting from the Company's decision in August 1954 to embark upon the beer can business and to satisfy further the demands of its largest customer for new products, would, in the instance of this particular Company, tend to neutralize the general market decline and make the stock at least as valuable on October 25 as it had been on August 3.

(c) The value of $15.50 would represent a price to adjusted earnings ratio of 8.03:1 on August 3 and 8.66:1 on October 25, 1954, a dividend yield (based upon a 50-cent annual dividend rate) of 3.23 percent, and 46.76 and 46.21 percent of book value on such dates respectively.

CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, the amount of recovery to be determined in accordance with Rule 38 (c).